UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| BRANDON RAYMOND JONES and THOMAS JOSEPH COLEMAN, III, | ) ) ) | |
| *Plaintiffs*, | ) ) | Case No. 1:12-cv-190 |
| v. | ) ) | Judge Mattice |
| HAMILTON COUNTY, TENNESSEE, | ) ) | |
| *Defendant*. | ) ) | |

## ORDER

Before the Court is Plaintiffs' Motion for Preliminary Injunction. (Doc. 16). Plaintiffs move the Court to enjoin Defendant Hamilton County, Tennessee ("Hamilton County" or "the County") from continuing its practice of commencing meetings of the Hamilton County Commission ("the Commission") with a prayer. This case presents a unique question, the legal underpinnings of which the United States Court of Appeals for the Sixth Circuit has yet to address. For the reasons explained below, Plaintiffs' Motion for Preliminary Injunction (Doc. 16) will be **DENIED**.

I.

In large measure, the parties have stipulated to the relevant facts in this case. (Doc. 38). Their stipulation binds the parties and the court alike. *Parks v. LaFace Records*, 329 F.3d 437, 444 n.2 (6th Cir. 2003).

Hamilton County is a political subdivision of the State of Tennessee, and the Commission is its elected legislature and final policymaker. The Commission conducts the County's business during its regularly scheduled public meetings. It begins those meetings with a prayer.

Prior to July 3, 2012, the Commission had no formal written prayer policy, but according to the parties, "invocation speakers came from a variety of faith traditions, including non-Christian faith traditions, and some speakers were invited by the County without knowing the faith tradition followed by the speaker." Invocations were offered by various individuals, including private citizens, local clergy, and the commissioners themselves. Some of the invocations "referred to a deity in a way consistent with the Christian faith."

In May 2012, the Freedom From Religion Foundation ("the Foundation") sent a letter to the Commission, objecting to the Commission's practice of beginning its meetings with prayer. (Doc. 17-2). The Foundation requested that the Commission discontinue all prayer before meetings.

The prayers continued, however, and at the Commission's June 14, 2012 meeting, a Christian pastor recited the "Lord's Prayer" as the invocation. (Doc. 38). During the prayer, some commissioners (as well as members of the audience) stood and joined in the spoken recitation of the prayer. Others bowed their heads. On June 15, 2012, Plaintiffs filed the instant suit. (Doc. 1).

The record demonstrates that prayers (both of which were invoked "in the name of Jesus") were also offered at the June 20 and June 28, 2012 Commission meetings. (DVD, June 20 & June 28 invocations).[1] On July 3, 2012, the invocation speaker recited the "Lord's Prayer," during which all visible commissioners are standing, and some are participating in the spoken recitation. (DVD, July 3 invocation).

---

[1] Occasionally herein, the Court will cite to digital recordings of prayers organized by date and stored on a DVD received into evidence on July 31, 2012. The videos are not contained within the Court's electronic record, but a physical copy of the DVD has been made a part of the record in this action. (*See* unnumbered docket entry dated July 31, 2012).

Also on July 3, 2012 – *after* the recitation of the "Lord's Prayer" – the Commission adopted Resolution 712-13, entitled "A Resolution Adopting a Policy Regarding Opening Invocations Before Meetings of the Hamilton County Commission" ("the prayer policy" or "the policy"). (Doc. 38-1). It expressly repealed and replaced any prior practices concerning opening invocations at Commission meetings. (*Id.* at 5). The resolution is nine pages in length, and it contains approximately five pages of preamble, in which various clauses set forth, *inter alia*, the Commission's intention to "invoke divine guidance"; quotes from Supreme Court and federal appellate cases concerning the constitutionality of legislative prayer; and the resolution's goal of adopting a policy that does not "proselytize or advance any particular faith, or show any purposeful preference of one religious view to the exclusion of others." (*Id.* at 1-5).

The policy permits "an eligible member of the clergy in Hamilton County, Tennessee," to give an invocation at the opening of Commission meetings. (*Id.* at 5). The invocation speakers are drawn from a list of "all the religious congregations with an established presence in Hamilton County." (*Id.*). Legislative Administrator Chris Hixson testified at the hearing on the instant Motion that she compiled the list based on local listings for religious institutions found within the Yellow Pages. The denominational character of all institutions on the list is not clear from the evidence of record, but the substantial majority is comprised of Christian churches. Institutions representing Muslim, Jewish, and Baha'i faiths, as well as others, are also included. (*See* Doc. 38-2). If an institution is not represented on the list, it may request inclusion via letter, with any dispute as to an organization's religious *bona fides* being resolved by reference to the Internal Revenue Code's guidelines for tax-exempt status. (Doc. 38-1 at 6).

The Commission does not engage in any content review of the invocations, and it places no guidelines on what may be said, except: "[T]he Commission requests that no invocation should proselytize or advance any faith, disparage the religious faith or non-religious views of others, or exceed five minutes in length." (Doc. 38). To that end, the policy dictates the contents of a letter to be mailed to religious leaders. (Doc. 38-1 at 7-8). It states that:

> This opportunity is voluntary, and you are free to offer the invocation according to the dictates of your own conscience. However, please try not to exceed no [sic] more than five (5) minutes for your presentation. To maintain a spirit of respect for all, the Commission requests only that the opportunity not be exploited as an effort to convert others to the particular faith of the invocation speaker, nor to disparage any faith or belief different than that of the invocation speaker.

(*Id.* at 7). Additionally, Commission agendas will include the following printed language:

> *Any invocation that may be offered before the official start of the Commission meeting shall be the voluntary offering of a private citizen, to and for the benefit of the Commission. The views or beliefs expressed by the invocation speaker have not been previously reviewed or approved by the Commission and do not necessarily represent the religious beliefs or views of the Commission in part or as a whole. No member of the community is required to attend or participate in the invocation and such decision will have no impact on their right to actively participate in the business of the Commission.*

(*Id.* at 8) (emphasis original).

Religious leaders will notify the Commission of their willingness to offer an invocation via reply letter. (*Id.* at 7-8). The policy provides that religious leaders will then be selected on a "first-come, first-serve basis." (*Id.* at 8). Since the adoption of the policy, religious leaders of various congregations – including Baptist, Lutheran, Church of God, Presbyterian, Jewish, and Unitarian Universalist – have volunteered to be placed on future meetings' agendas as the invocation speaker. (Doc. 38).

4

Since the adoption of the policy, the Commission's invocation practice has continued to involve Christian prayer, though the record contains evidence of invocations offered at only two subsequent meetings. The July 12, 2012 prayer asks for divine guidance and blessings on the Commission "in Jesus' name." (DVD, July 12 invocation). The July 18 prayer seeks the same, but it is sought "in the name of Jesus Christ, our savior, your son, and our only hope, in Jesus' name." (DVD, July 18 invocation).

Plaintiffs have moved the Court to issue a preliminary injunction. (Doc. 16). They ask the Court to "halt the prayer activities of the defendant[] pending a final disposition of this matter." Plaintiffs essentially contend that, under *Lemon v. Kurtzman*, 403 U.S 602, 612 (1971), the Commission's practice of beginning its meetings with an invocation is unconstitutional. (*Id.*; *see* Docs. 17, 19, 21, 24, 60). They characterize the prayer policy as a "sham," and they therefore ask the Court to temporarily enjoin the County from beginning Commission meetings with a prayer. (*See, e.g.,* Docs. 24, 60).

Defendant opposes Plaintiffs' Motion. (Docs. 39, 63). Succinctly put, it asserts that the challenge to the policy is necessarily facial and that the policy, as written, withstands constitutional scrutiny. (*See* Doc. 63 at 3-5). It further asserts that the Supreme Court has "clearly approved legislative prayers that are explicitly Christian," and, alternatively, that the entire question before the Court may be non-justiciable. (*Id.* at 11-15).

II.

A.

At this stage of litigation, the only relief sought is Plaintiff's requested preliminary injunction. The United States Court of Appeals for the Sixth Circuit recently reiterated that, when reviewing motions for preliminary injunctions, courts must consider:

> (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without a preliminary injunction; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction.

*McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (citing *Am. Imaging Svcs., Inc. v. Eagle-Picher Indus., Inc.* (*In re Eagle-Picher Indus., Inc.*), 963 F.2d 855, 858 (6th Cir. 1992)). In First Amendment cases, "the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits. This is so because the issues of the public interest and harm to the respective parties largely depend on the constitutionality of the state action." *Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012) (quotation and alterations omitted).

The preliminary injunction considerations are factors to be balanced; they are not prerequisites that must each be satisfied before preliminary relief may issue. *Eagle-Picher*, 963 F.2d at 859. Nor are they "rigid and unbending requirements" – rather, "[t]hese factors simply guide the discretion of the court." *Id.* The party seeking a preliminary injunction bears the burden of justifying such relief. *Id.*

The issuance of a preliminary injunction is an "extraordinary remedy" that may only occur "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC*, 555 U.S. 7, 22, 24 (2008). Plaintiffs seeking preliminary relief must

demonstrate not only the *possibility* of future harm, but "that in the absence of a preliminary injunction, the applicant is *likely* to suffer irreparable harm before a decision on the merits can be reached." *Id.* (emphasis added) (citation omitted). "Because injunctive relief is drafted in light of what the court believes will be the future course of events, a court must never ignore significant changes in the law or circumstances underlying an injunction lest the decree be turned into an 'instrument of wrong.'" *Salazar v. Buono*, 130 S. Ct. 1803, 1816 (2010) (plurality opinion) (citation omitted).

Inasmuch as a preliminary injunction is designed to stave off irreparable harm an applicant is likely to suffer before resolution of a case's merits, it is necessarily prospective in nature. *See, e.g., Doe v. Briley*, 562 F.3d 777, 781 (6th Cir. 2009) (noting that permanent and temporary injunctions are "prospective judgments," subject to revisitation when their prospective application is no longer equitable). On July 3, 2012 – after the initiation of the instant litigation – the Commission passed Resolution 712-13, officially adopting a new written policy to govern its invocation practices. The new policy unambiguously replaces any prior policy or practice concerning opening invocations at Commission meetings. Therefore, any future constitutional violation that the Commission and Hamilton County may commit – and any resulting harm visited upon Plaintiffs and the public – must necessarily occur under the auspices of the July 3, 2012 prayer policy.

Consequently, when reviewing Plaintiffs' Motion for Preliminary Injunction and the likelihood of their success on the merits, the Court will assess whether, based on the present record before it, they have demonstrated that the newly implemented prayer policy is likely to result in a constitutional violation.

7

B.

Plaintiffs have sued Hamilton County for a purported constitutional violation pursuant to 42 U.S.C. § 1983. In pertinent part, § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983.

It is well settled that municipalities and other local governing bodies may be sued under § 1983. *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978). In order to establish municipal liability under § 1983, however, "the plaintiff must establish that: (1) the plaintiff's harm was caused by a constitutional violation; and (2) the [municipality] was responsible for that violation." *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009). To demonstrate that a municipality is responsible for a constitutional violation, a plaintiff must point to some "policy" or "custom" of the municipal defendant causing the complained-of constitutional violation. *Monell*, 436 U.S. at 691. This "official policy" requirement is intended to ensure that a municipality is held liable only for its own acts rather than the acts of its employees – a municipality cannot be held responsible under a theory of *respondeat superior. See id.*; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

There are a variety of ways in which a plaintiff may establish the existence of a policy or custom sufficient to implicate § 1983 municipal liability. *See Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). First, and most obviously, "official policies" are often considered to be "formal rules or understandings – often but not

always committed to writing – that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur*, 475 U.S. at 480-81. Thus, a plaintiff may point to legislative enactments or officially adopted policies. *Thomas*, 398 F.3d at 429; *see Monell*, 436 U.S. at 690. Second, actions taken by officials with final decision-making authority may render a municipal entity liable under § 1983. *Thomas*, 398 F.3d at 429; *see Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397 (1997). Third, § 1983 plaintiffs may identify a policy of inadequate training or supervision. *Thomas*, 398 F.3d at 429. Finally, a municipality can be shown to have a "custom" that causes constitutional violations – even if that custom was not formally sanctioned – "provided that the plaintiff offers proof of policymaking officials' knowledge and acquiescence to the established practice." *Id.*; *Spears*, 589 F.3d at 256 (citing *Monell*, 436 U.S. at 690-91; *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004)). In other words, a plaintiff may establish § 1983 municipal liability by establishing "a custom of tolerance or acquiescence of federal rights violations." *Id.*

In any case, a plaintiff must also demonstrate a "direct causal link" between the challenged policy or custom and the alleged constitutional violation. *Spears*, 589 F.3d at 256 (citation omitted). That is, the "plaintiff must establish that his or her constitutional rights were violated and that a policy or custom of the municipality was the 'moving force' behind the deprivation of the plaintiff's rights." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254-55 (6th Cir. 2010).

Here, Hamilton County recently adopted a formal resolution permitting "opening invocations before meetings of the Hamilton County Commission." It has also

9

stipulated that, prior to the implementation of the formal policy, the Commission "start[ed] [its] meetings with an invocation." There can be little doubt that, within the meaning of § 1983, Hamilton County operated for all relevant times under a policy of permitting prayer at the beginning of Commission meetings. The Court must therefore determine whether that policy, as written or implemented, violates the First Amendment.

### III.

### A.

The First Amendment to the United States Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. At issue here is the Establishment Clause – providing that "Congress shall make no law respecting an establishment of religion" – which has been incorporated against the states via the Fourteenth Amendment. *See Everson v. Bd. of Educ.*, 330 U.S. 1, 5 (1947).

The language of the Establishment Clause is "at best opaque" and, as the Sixth Circuit has noted, "far from self-defining." *ACLU v. DeWeese*, 633 F.3d 424, 430 (6th Cir. 2011) (quotation omitted). Rather, "[t]he Clause erects a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." *Lynch v. Donnelly*, 465 U.S. 668, 679 (1984) (quotation omitted). In 1971, recognizing the need for analytical guidance as well as the importance (and murkiness) of the First Amendment's prohibition on the establishment of religion, the Supreme Court articulated a three-part test for determining whether government conduct violates the

Establishment Clause. *See Lemon v. Kurtzman*, 403 U.S 602, 612 (1971). That test "asks (1) whether the challenged government action has a secular purpose; (2) whether the action's primary effect neither advances nor inhibits religion; and (3) whether the action fosters an excessive entanglement with religion." *DeWeese*, 633 F.3d at 430-31 (alterations omitted) (quoting *ACLU v. Ashbrook*, 375 F.3d 484, 490 (6th Cir. 2004), and citing *Lemon*, 403 U.S. at 612-13).[2]

Plaintiffs urge the Court to adopt the so-called "*Lemon* test," apply it to the facts at hand, determine that Hamilton County's practice of beginning Commission meetings with prayer offends the First Amendment, grant the Motion for Preliminary Injunction, and be done with the matter altogether. Undeniably, this would be a straightforward approach that – if applicable – would produce a clear result based on a succinct three-pronged inquiry. However, considerations of brevity notwithstanding, *Lemon* is not, and cannot be, the foundation on which the Court's analysis rests.

Purported Establishment Clause violations appear in a variety of contexts. In *Lemon*, for example, the Supreme Court considered statutory programs that provided financial support to church-related elementary and secondary schools. *See Lemon*, 403 U.S. at 606-07. Other cases have involved governmental displays of the Ten Commandments, *e.g., Van Orden v. Perry*, 545 U.S. 677 (2005), or of other religious imagery on public property, *e.g., Cnty. of Allegheny v. ACLU*, 492 U.S. 573 (1989). Still others implicate the constitutionality (or lack thereof) of prayers offered during public

---

[2] The first and second prongs of the *Lemon* test were reformulated in view of the Supreme Court's opinion in *McCreary Cnty., Ky. v. ACLU*, 545 U.S. 844 (2005). *See ACLU v. Mercer Cnty., Ky.*, 432 F.3d 624 (6th Cir. 2005) ("The first and second prongs [of the *Lemon* test] have since been reformulated. After *McCreary County*, the first is now the predominant purpose test . . . The second, the so-called "endorsement" test, asks whether the government action has the purpose or effect of endorsing religion.") (citing, *inter alia*, *McCreary Cnty.*, 545 U.S. at 860-61; *id.* at 900-02 (Scalia, J., dissenting)).

school events, *e.g, Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000) (addressing prayer at public school football games).

At times, the Supreme Court has invoked *Lemon* with scant explanation. *See, e.g., Bowen v. Kendrick*, 487 U.S. 589, 602 (1988) ("As in previous cases involving facial challenges on Establishment Clause grounds . . . we assess the constitutionality of an enactment by reference to the three factors first articulated in *Lemon v. Kurtzman* . . . .) (citations omitted). On other occasions, the Court has cited *Lemon*, but "emphasized [its] unwillingness to be confined to any single test or criterion in this sensitive area." *Lynch*, 465 U.S. at 679. In yet other Establishment Clause cases, the Court has disregarded *Lemon* altogether. *See, e.g., Zelman v. Simmons-Harris*, 536 U.S. 639 (2002) (addressing a school voucher program). As the Sixth Circuit has observed, this approach has, at times, yielded inconsistent holdings.[3] *Compare Van Orden*, 545 U.S.

---

[3] It has also received the sharp disapproval of more than one Supreme Court Justice. In *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993), Justice Scalia considered the Court's disposition of various Establishment Clause cases, writing:

> As to the Court's invocation of the *Lemon* test: Like some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried, Lemon stalks our Establishment Clause jurisprudence once again, frightening the little children and school attorneys of Center Moriches Union Free School District. Its most recent burial, only last Term, was, to be sure, not fully six feet under: Our decision in *Lee v. Weisman*, 505 U.S. 577, 586–587 (1992), conspicuously avoided using the supposed "test" but also declined the invitation to repudiate it. Over the years, however, no fewer than five of the currently sitting Justices have, in their own opinions, personally driven pencils through the creature's heart (the author of today's opinion repeatedly), and a sixth has joined an opinion doing so. . . .

> The secret of the *Lemon* test's survival, I think, is that it is so easy to kill. It is there to scare us (and our audience) when we wish it to do so, but we can command it to return to the tomb at will. *See, e.g., Lynch v. Donnelly*, 465 U.S. 668, 679 (1984) (noting instances in which Court has not applied *Lemon* test). When we wish to strike down a practice it forbids, we invoke it, *see, e.g., Aguilar v. Felton*, 473 U.S. 402, (1985) (striking down state remedial education program administered in part in parochial schools); when we wish to uphold a practice it forbids, we ignore it entirely, see *Marsh v. Chambers*, 463 U.S. 783 (1983) (upholding state legislative chaplains). Sometimes, we take a middle course, calling its three prongs "no more than helpful signposts," *Hunt v. McNair*, 413 U.S. 734, 741 (1973). Such a docile and useful monster is worth keeping around, at least in a somnolent state; one never knows when one might need him.

at 684 n.3 (considering the display of the Ten Commandments at the Texas State Capitol, declining to apply *Lemon*, and noting "[d]espite Justice Stevens' recitation of occasional language to the contrary . . . we have not, and do not, adhere to the principle that the Establishment Clause bars any and all governmental preference for religion over irreligion") (plurality opinion) *with McCreary Cnty., Ky. V. ACLU*, 545 U.S. 844, 860 (2005) (considering the display of the Ten Commandments in state courthouses, applying *Lemon*, and holding that "[t]he touchstone for our analysis is the principle that the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion'"); *but see DeWeese*, 633 F.3d at 431 (taking note of this inconsistency and holding: "Nevertheless, *Lemon* remains the law governing Establishment Clause cases."); *ACLU v. Mercer Cnty., Ky.*, 432 F.3d 624, 636 (6th Cir. 2005) ("[W]e remain in Establishment Clause purgatory.").

Unlike the parties to the cases listed above, the Plaintiffs in this suit do not seek redress based on prayers offered at public school functions. They do not challenge a government's religious display. They do not attempt to limit the government's interaction with religious schools. They instead seek to halt prayers said before an elected legislature. This, then, is not a case about the Establishment Clause in general. It is a case about legislative prayer – a peculiar subspecies of government conduct implicating the First Amendment. *See, e.g., Joyner v. Forsyth Cnty.*, 653 F.3d 341, 345 (4th Cir. 2011) ("[T]his is not a case about the Establishment Clause in general, but about legislative prayer in particular."); *Snyder v. Murray City Corp.*, 159 F.3d 1227,

---

*Lamb's Chapel*, 508 U.S. at 398-99 (Scalia, J. concurring); *see also, e.g., Utah Highway Patrol Ass'n v. Am. Atheists, Inc.*, 132 S.Ct. 12 (mem.) (2011) (Thomas, J. dissenting from denial of *certiorari*) (noting that lower courts have expressed confusion as to the applicability of *Lemon* and stating that "[o]ur jurisprudence provides no principled basis by which a lower court could discern whether *Lemon* /endorsement, or some other test, should apply in Establishment Clause cases").

1232 (10th Cir. 1999) (en banc) ("[T]he evolution of Establishment Clause jurisprudence indicates that the constitutionality of legislative prayers is a *sui generis* legal question.").[4]

Viewing the case law on the whole, there is a lack of guidance as to *Lemon*'s applicability within the greater universe of Establishment Clause jurisprudence. However, one thing at least appears settled: regardless of when and how *Lemon* may steer the course of courts' Establishment Clauses analyses, in the narrow context of legislative prayer, it simply does not apply.

The Court reaches this conclusion (and begins its analysis of the merits of Plaintiffs' Motion), as it must, in view of the Supreme Court's decision in *Marsh v. Chambers*, 463 U.S. 783 (1983), the first and only opinion in which the Supreme Court has squarely addressed the issue of legislative prayer. In *Marsh*, the Court considered "whether the Nebraska Legislature's practice of opening each legislative day with a prayer by a chaplain paid by the State violates the Establishment Clause of the First Amendment." *Id.* at 784. In its analysis, the Court made no mention of *Lemon* or the syllabus it established.[5] Instead, the Court focused on the unique position legislative prayer occupies in American history, beginning with the recognition that

> [t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country. From colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom.

---

[4] The Sixth Circuit also appears to have recognized – albeit indirectly – a distinction between the analysis in legislative prayer cases and that which is employed in other Establish Clause contexts. *See, e.g., ACLU v. Ashbrook*, 375 F.3d 484, 494-95 (6th Cir. 2004) (rejecting the application of *Marsh v. Chambers, infra*, to the display of the Ten Commandments in county courthouses); *Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 381 (6th Cir. 1999) (en banc) ("*Marsh* is one-of-a-kind . . . .") .

[5] A careful reading of *Marsh* demonstrates that the decision to forgo the *Lemon* test was more than mere oversight. The Supreme Court expressly noted that the appellate court applied *Lemon*'s three-part test, but it declined to do so in its own analysis. *Marsh*, 463 U.S. at 786.

*Id.* at 786. The Court engaged in a lengthy historical analysis, recognizing that Members of the First Congress approved the First Amendment and appointed a legislative chaplain in the same week, and concluding that "[i]t can hardly be thought that . . . they intended the Establishment Clause . . . to forbid what they had just declared acceptable." *Id.* at 790. Ultimately, "in light of the unambiguous and unbroken history of more than 200 years," the Court concluded that

> there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an "establishment" of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country. As Justice Douglas observed, "[w]e are a religious people whose institutions presuppose a Supreme Being."

*Id.* at 792 (citing *Zorach v. Clauson*, 343 U.S. 306, 313 (1952)).

After determining that legislative prayer was generally constitutionally permissible, the Court addressed the chaplain's lengthy appointment and the nature of the prayers he offered before the legislature. The Court suggested that the selection and retention of the minister may violate the Establishment Clause if based on an "impermissible motive." *Id.* at 793-94. Absent evidence of such motivation, the Court rejected the argument that his long tenure had "the effect of giving preference to his religious views," noting that the minister characterized his prayers as "nonsectarian," "Judeo Christian," and involving "elements of the American civil religion." *Id.* at 793 n.14. Though some of his earlier prayers were overtly Christian, he removed all references to Christ after receiving a complaint from a Jewish legislator. *Id.* The Court noted:

> Beyond the bare fact that a prayer is offered, three points have been made: first, that a clergyman of only one denomination – Presbyterian – has been selected for 16 years; second, that the chaplain is paid at public

expense; and third, that the prayers are in the Judeo-Christian tradition. Weighed against the historical background, these factors do not serve to invalidate Nebraska's practice.

*Id.* at 793. The Court cautioned: "The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer." *Id.* at 794-95.

In *Marsh*, the Supreme Court essentially dictated that the guidance offered by *Lemon* (and other traditional Establishment Clause jurisprudence) does not extend to the realm of legislative prayer. The Court has recognized as much itself. *See, e.g., Edwards v. Aguillard*, 482 U.S. 578, 583 n.4 (1987) ("The Lemon test has been applied in all cases since its adoption in 1971, except in *Marsh*[, *supra*] . . . . The Court based its conclusion in that case on the historical acceptance of the practice."); *Lynch*, 465 U.S. at 679 ("In two cases, the Court did not even apply the *Lemon* 'test.' We did not, for example, consider that analysis relevant in *Marsh*, *supra*."). This Court thus concludes that its decision concerning the constitutionality of the legislative prayer practice at issue in this lawsuit will turn largely on an interpretation and application of the standards articulated in *Marsh*.[6]

In 1989, the Supreme Court had occasion to revisit *Marsh* and provide some direction as to its application, albeit in a case not involving legislative prayer. *See Cnty.*

---

[6] The Court's research yielded – and the parties have identified – no legislative prayer case that post-dates *Marsh* and either (1) disregards *Marsh* or (2) relies on *Lemon* to test the constitutionality of a challenged prayer practice. *See, e.g., Galloway v. Town of Greece*, 681 F.3d 20, 26 (2d Cir. 2012); *Joyner v. Forsyth Cnty.*, 653 F.3d at 345; *Pelphrey v. Cobb Cnty.*, 547 F.3d 1263, 1268-69 (11th Cir. 2008); *Hinrichs v. Bosma*, 440 F.3d 393 (7th Cir. 2006); *Snyder v. Murray City Corp.*, 159 F.3d 1227, 1232 (10th Cir. 1999) (en banc).

*of Allegheny v. ACLU*, 492 U.S. 573 (1989).[7]  In *Allegheny*, the Court concluded in part that a crèche displayed in a county courthouse violated the Establishment Clause (though, for reasons not relevant to this case, the display of a Menorah at a different public building did not).  *See id.* at 595-602.  In response to Justice Kennedy's dissent, the majority specifically addressed the contours of its holding in *Marsh*:

> However history may affect the constitutionality of nonsectarian references to religion by the government, history cannot legitimate practices that demonstrate the government's allegiance to a particular sect or creed.

> Indeed, in *Marsh* itself, the Court recognized that not even the "unique history" of legislative prayer . . . can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief. . . . The legislative prayers involved in *Marsh* did not violate this principle because the particular chaplain had "removed all references to Christ." . . . Thus, *Marsh* plainly does not stand for the sweeping proposition Justice Kennedy apparently would ascribe to it, namely, that all accepted practices 200 years old and their equivalents are constitutional today. Nor can *Marsh*, given its facts and its reasoning, compel the conclusion that the display of the crèche involved in this lawsuit is constitutional. Although Justice Kennedy says that he "cannot comprehend" how the crèche display could be invalid after *Marsh . . .*, surely he is able to distinguish between a specifically Christian symbol, like a crèche, and more general religious references, like the legislative prayers in *Marsh*.

> Justice Kennedy's reading of *Marsh* would gut the core of the Establishment Clause, as this Court understands it. The history of this Nation, it is perhaps sad to say, contains numerous examples of official acts that endorsed Christianity specifically. Some of these examples date back to the Founding of the Republic, but this heritage of official discrimination against non-Christians has no place in the jurisprudence of the Establishment Clause. Whatever else the Establishment Clause may mean (and we have held it to mean no official preference even for religion over nonreligion, *see, e.g., Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989)), it certainly means at the very least that

---

[7] Hamilton County characterizes the *Allegheny* Court's elucidation of *Marsh* as Justice Blackmun's "plurality opinion." (*See* Doc. 63 at 6-7 n.3).  The County is incorrect.  Justice Blackmun "announced the judgment of the Court and delivered the opinion of the Court with respect to parts III-A, IV, and V, in which Brennan, Marshall, Stevens, and O'Connor, JJ. joined . . . ."  *Allegheny*, 492 U.S. at 577.  The Court's discussion of *Marsh* is contained within part V of the opinion, which was written on behalf of the majority.  Thus, it is the opinion of the Court, not of Justice Blackmun.

government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions). "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244, 102 S.Ct. 1673, 1683, 72 L.Ed.2d 33 (1982). There have been breaches of this command throughout this Nation's history, but they cannot diminish in any way the force of the command.

*Id.* at 602-05 (footnotes and select internal citations omitted). The Court went on to recognize "the bedrock Establishment Clause principle that, regardless of history, government may not demonstrate a preference for a particular faith . . . ." *Id.* at 605.

In *Lee v. Weisman*, 505 U.S. 577 (1992), the Supreme Court considered a school principal's directive that commencement prayers be nondenominational. The court clarified that the government should not ordinarily dictate the content of prayer. *See id.* at 588-90. Notably, *Lee* involved a situation the Court expressly recognized as distinct from legislative prayer: a benediction offered as part of public school graduation ceremonies. *See id.* at 580-81, 597-98. While *Lee*'s applicability to the case at bar is somewhat unclear, the Court spoke in relatively broad terms: "It is a cornerstone principle of our Establishment Clause jurisprudence that it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government . . . ." *Id.* at 588 (quotation omitted). The Court held that "the First Amendment does not allow the government to stifle prayers which aspire to [nonsectarian] ends, neither does it permit the government to undertake that task for itself." *Id.* at 589. In short, the Court rejected "[t]he suggestion that government may establish an official or civil religion as a means of avoiding the establishment of a religion with more specific creeds . . . ." *Id.* at 590.

It is largely within this framework that circuit courts have taken up the difficult task of evaluating the constitutionality of legislative prayer. As represented by the

parties and confirmed by the Court's independent research, it appears that the Sixth Circuit has yet to address the issue head-on. It has, however, discussed the Establishment Clause and *Marsh* generally; these cases provide some guidance.

In *Stein v. Plainwell Cmty. Schs.*, 822 F.2d 1406, 1409 (6th Cir. 1987), the Sixth Circuit provided its interpretation of the holding in *Marsh*:

> In *Marsh v. Chambers*, the Supreme Court, looking primarily to the intent of the framers of the Constitution and historical practice since 1789, upheld "nonsectarian," . . . "nonproselytizing" legislative invocations that do not "symbolically place the government's official seal of approval on one religious view." . . . The Court emphasized that "civil" or secularized invocations are used across the country to open legislative, judicial, and administrative sessions of state legislatures, city councils, courts and other public bodies, as well as by private institutions of all kinds. So long as the invocation or benediction on these public occasions does not go beyond "the American civil religion," so long as it preserves the substance of the principle of equal liberty of conscience, no violation of the Establishment Clause occurs under the reasoning of *Marsh*.

*Id.* (citations and footnote omitted). Importantly, the holding in *Stein* was announced before *Allegheny* and *Lee* were decided, the latter of which specifically addressed *Stein* and affirmed an appellate court opinion that found *Stein* to be "flawed." *See id.* at 586; *Weisman v. Lee*, 908 F.2d 1090 (1st Cir. 1990).

In 1992, after both *Allegheny* and *Lee* were decided, the Sixth Circuit held that the privately funded menorah display erected in a traditional public form did not violate the Establishment Clause. *Americans United for Separation of Church and State v. City of Grand Rapids*, 980 F.2d 1538 (6th Cir. 1992) (en banc). In reaching its decision, the court quoted Justice O'Connor's concurrence in *Allegheny*, in which she discussed the constitutional permissibility of legislative prayer: "It is the combination of the *longstanding existence* of practices such as opening legislative sessions with legislative prayers, as well as their *nonsectarian nature*, that lead me to the conclusion that those

particular practices, despite their religious roots, do not convey a message of endorsement of particular religious beliefs." *Id.* at 1544 (quoting *Allegheny*, 492 U.S at 630-31) (emphasis supplied by the Sixth Circuit).

Other more recent cases reach conclusions similar to those in *Stein* and *Americans United*. *See, e.g., ACLU v. Capitol Square Review & Advisory Bd.*, 243 F.3d 289, 300 (6th Cir. 2001) (en banc) (citing *Marsh* and concluding that Ohio's Motto, "With God, All Things are Possible," was "[l]ike state-financed prayers by a legislative chaplain . . . simply a tolerable acknowledgement of beliefs widely held among the people of this country."); *Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 379-80 (6th Cir. 1999) (recognizing what the court called *Marsh*'s "Legislative Prayer Exception" and noting that such prayer was permissible due to its unique history); *Washegesic v. Bloomingdale Pub. Schs.*, 33 F.3d 679, 683 (6th Cir. 1994) (relying on *Stein*, and characterizing *Marsh* as "upholding 'non-sectarian' legislative invocations"). None of these holdings, however, dealt squarely with the issue of legislative prayer. Thus, the Court turns its attention to other circuits' attempts to define the constitutional boundaries of legislative prayer in the wake of *Marsh*.

Most recently, the Second Circuit considered a case in which residents brought a civil rights action against a town, alleging that the practice of opening town board meetings with a prayer violated the Establishment Clause. *Galloway v. Town of Greece*, 681 F.3d 20 (2012). For all relevant periods, the town did not have a formal prayer policy, but the opportunity to conduct the invocation at board meetings was open: anyone (including atheists and nonreligious individuals) were permitted to request permission to offer the meeting invocation, and the town had never rejected a request. *Id.* at 23. A Wiccan priestess, a Baha'i congregant, and other non-Christians had offered

invocations, but the town was largely Christian, and Christian clergy members gave the majority of prayers. *Id.* at 23-25. Roughly two-thirds of the prayers given in the ten-year period at issue made some reference to Jesus Christ, and the remaining third made general theistic references. *Id.* at 24-25.

Discussing *Marsh* and *Allegheny*, the court surveyed other appellate opinions and concluded that a legislature's prayer practice – when viewed in its entirety – cannot advance a single religious sect, or otherwise "proselytize," "disparage," or "have the effect of affiliating the government with any one specific faith or belief." *Id.* at 28 (citing *Allegheny*, 492 U.S. at 603; *Marsh*, 463 U.S. at 794-95). Nevertheless, the court held that the Establishment Clause did not preclude all legislative invocations "that are denominational in nature," and it emphasized that the sectarian nature of some individual prayers was not inherently a problem.[8] *Id.* at 28, 31-32. Instead, the court asked "whether the town's practice, viewed in its totality by an ordinary, reasonable observer, conveyed the view that the town favored or disfavored certain religious beliefs." *Id.* at 29-30. It found that it did not need to "embark on a sensitive evaluation" or "parse the content of a particular prayer" (as prohibited by *Marsh*) to recognize that the vast majority of prayers offered were uniquely Christian. Further noting that the town's process of inviting prayer-givers from only within the town borders "virtually ensured" a Christian viewpoint, the court found that the town's prayer practice violated the Establishment Clause.

The Fourth Circuit has had several opportunities to take up the issue of legislative prayer. *See Joyner v. Forsyth Cnty.*, 653 F.3d 341 (4th Cir. 2011), *cert. denied*, 132 S.Ct.

---

[8] The Second Circuit left open the possibility that "*Stein* might be read simply to reiterate" the standard articulated in *Allegheny* rather than "precluding denominational content in any individual prayer." *See Galloway*, 681 F.3d at 28-29 (citing *Stein*, 822 F.2d at 1409).

1097 (2012); *Simpson v. Chesterfield Cnty. Bd. of Supervisors*, 404 F.3d 276 (4th Cir. 2005), *cert. denied*, 546 U.S. 937 (2005); *Wynne v. Town of Great Falls*, 376 F.3d 292 (4th Cir. 2004), *cert. denied*, 545 U.S. 1152 (2005). In *Joyner*, the most recent of those instances, the court considered a case that was, in some respects, similar to the one before this Court: residents brought suit against a county board of commissioners, alleging that its policy of opening public meetings with clergy-led prayers violated the Establishment Clause. *Joyner*, 653 F.3d at 343-44. As in this case, the county did not have a written policy in place at the time the suit was filed but adopted one after litigation began.[9] *See id.* at 343-44. Unlike this case, however, the plaintiffs in *Joyner* put before the court a post-policy record of prayers spanning approximately one-and-a-half years, in which "almost four-fifths" of the prayers made explicit references to Jesus Christ. *See id.* at 344.

    *Joyner* relied on past Fourth Circuit cases – namely *Simpson* and *Wynne* – in noting that the court had "repeatedly [upheld] the practice of legislative prayer," and that invocations at the start of legislative sessions serve many functions, such as

---

[9] The Court notes that the policy at issue in *Joyner* was remarkably similar – and in parts, nearly identical – to the one adopted by Hamilton County. *Compare, e.g.,* (Doc. 38-1 at 7), stating in the letter sent to invited religious leaders that:

> This opportunity is voluntary, and you are free to offer the invocation according to the dictates of your own conscience. However, please try not to exceed no [sic] more than five (5) minutes for your presentation. To maintain a spirit of respect for all, the Commission requests only that the opportunity not be exploited as an effort to convert others to the particular faith of the invocation speaker, nor to disparage any faith or belief different than that of the invocation speaker.

*with Joyner*, 653 F.3d at 343, noting that the letter sent to invocation speakers in that case stated:

> This opportunity is voluntary, and you are free to offer the invocation according to the dictates of your own conscience. To maintain a spirit of respect and ecumenism, the Board requests only that the prayer opportunity not be exploited as an effort to convert others to the particular faith of the invocational speaker, nor to disparage any faith or belief different than that of the invocational speaker.

(*See also* M.D.N.C. Case No. 1:07-cv-243, Doc. 65-2).

solemnizing the occasion, urging participants to act "on their noblest instinct," and fostering humility. *Id.* at 346-47. However, the Fourth Circuit placed "clear boundaries on invocations . . . approving legislative prayer only when it is nonsectarian in both policy and practice." *Id.* at 347-48. The court determined that "infrequent" references to specific deities, standing alone, do not constitute a violation of the First Amendment, but that "legislative prayer must strive to be nondenominational so long as that is reasonably possible – it should send a signal of welcome rather than exclusion." *Id.* at 349. The court characterized the county's policy as facially neutral, but referencing specific prayers said before the board, it noted that the policy, as implemented, resulted in "sectarian invocations meeting after meeting that advanced Christianity and that made at least two citizens feel uncomfortable, unwelcome, and unwilling to participate in the public affairs of Forsyth County." *Id.* at 354 (noting further that "citizens attending [b]oard meetings hear the prayers, not the policy."). The court therefore held that the facially neutral policy, as implemented, violated the Establishment Clause.

In 2008, the Eleventh Circuit upheld a county prayer practice in deciding a case on which Hamilton County now heavily relies, *Pelphrey v. Cobb Cnty., Ga.*, 547 F.3d 1263 (11th Cir. 2008).[10] The Court in that case considered whether a county commission's practice of allowing volunteer religious leaders to offer invocations on a rotating basis violated the Establishment Clause. *Id.* at 1266. The Eleventh Circuit determined that, even though 70 percent of the invocations offered over 10 years contained Christian references, there was no evidence of exploitation of the practice to

---

[10] In *Pelphrey*, the Eleventh Circuit considered separately whether a county planning commission's invocation practice violated the Establishment Clause. It upheld the county commission's practice, but it found that the planning commission's ran afoul of the First Amendment, as the planning commission had "categorically excluded" certain faiths from offering prayers. *Pelphrey*, 547 F.3d at 1282.

advance religious particular beliefs. *Id.* at 1278. Thus, the court declined to "parse or censor the legislative prayers" at issue. *Id.*

Even though the county relied on predominantly Christian speakers, the Eleventh Circuit noted that the prayers were also offered by members of the Jewish, Unitarian, and Muslim faiths. *Id.* at 1277. This, the court declared, "represented 'a wide cross-section of the [c]ounty's religious leaders.'" *Id.* (quoting *Simpson*, 404 F.3d at 285). Viewing the prayers cumulatively, the court determined that the "diversity of the religious expressions" supported a finding that the prayer practice did not advance any particular faith. *Id.* at 1278. Consequently, the court upheld the prayer practice as constitutional. *Id.* Notably, in so doing, the Eleventh Circuit characterized relevant portions of *Stein* (specifically, the Sixth Circuit's statements concerning *Marsh*) as "dicta" later rejected by the Supreme Court. *Id.* at 1274.

Other courts have addressed the scope of *Marsh*'s reasoning, some more permissively than others. For example, the Tenth Circuit summarized: "[T]he kind of legislative prayer that will run afoul of the Constitution is one that proselytizes a particular religious tenet or belief, or that aggressively advocates a specific religious creed, or that derogates another religious faith or doctrine." *Snyder*, 159 F.3d at 1234. In refusing to stay an injunction against a prayer policy employed by the Indiana House of Representatives, the Seventh Circuit "read *Marsh* as hinging on the nonsectarian nature of the invocations at issue there." *Hinrichs v. Bosma*, 440 F.3d 393, 400-01 (7th Cir. 2006) (rejecting the argument that, under *Marsh*, "all legislative prayer is constitutionally permissible"). And in an unpublished opinion, the Ninth Circuit held that a school board's practice of nearly uniformly praying "in the Name of Jesus" would have violated the Establishment Clause as interpreted by *Marsh*. *Bacus v. Palo Verde*

*Unified Sch. Dist. Bd. of Educ.*, 52 F. App'x 355, 356-57 (9th Cir. 2002) (addressing without deciding whether a school board was more similar to a "school prayer" or a "legislative prayer" setting).

When taken together, *Marsh*, *Allegheny*, and the circuit courts' subsequent jurisprudence yield certain broad themes. First, as discussed above, legislative prayer has a unique and well-established history that, relative to the First Amendment, renders it unlike other types of government conduct. It presents a *sui generis* legal question, one that the Sixth Circuit has yet to fully address.

Second, in large measure due to the unique historical place it occupies, legislative prayer is, in general, permissible. *Marsh*, 463 U.S. at 795. Legislatures may call upon – or even employ – ordained ministers to invoke divine guidance on a group of elected officials. *Id.* Although such conduct may "harmonize with the tenets of some or all religions," it does not "symbolically plac[e] the government's official seal of approval on one religious view." *Id.* at 792 (quotation omitted). It is instead "a tolerable acknowledgement of beliefs widely held among the people of this country." *Id.* Thus, to the extent a clear message can be heard from *Marsh*, it is this: as a basic legal principle, the Establishment Clause is not offended if a legislature formally invokes divine blessings on its official business.

Finally, despite its marked differences from other governmental involvement with the sacred, a legislature's ability to call on the divine at public meetings is not limitless. Historical patterns, standing alone, cannot justify violations of constitutional guarantees, and the government may not express its allegiance to a particular sect or creed. *Marsh*, 463 U.S. at 790; *Allegheny*, 492 U.S. at 603. It is for that reason that the prayer opportunity cannot be used to proselytize listeners. *See, e.g.*, *Marsh*, 463 U.S. at

794; *Allegheny*, 492 U.S. at 603; *Joyner*, 653 F.3d at 350-51; *Snyder*, 159 F.3d at 1234. Likewise, such prayer practices may not be used to advance any one belief or to disparage any other. *See, e.g., Marsh*, 463 U.S. at 794; *Allegheny*, 492 U.S. at 603; *Galloway*, 681 F.3d at 28. Nor may legislative prayers "have the effect of affiliating the government with one specific faith or belief." *Allegheny*, 492 U.S. at 603. Even when operating under a facially neutral policy, a legislature may not select invocational speakers based on impermissible motives or sectarian preferences. *Marsh*, 463 U.S. at 793-94; *see, e.g., Pelphrey*, 547 F.3d at 1278. In short, nothing in *Marsh* or its progeny diminishes the force of the "clearest command of the Establishment Clause[, which] is that one religious denomination cannot be officially preferred over another." *Allegheny*, 492 U.S. at 605.

It is with these precepts in mind that this Court undertakes the task of determining whether Hamilton County's prayer practice, as established by the language of the policy itself and the facts currently of record, violates the Constitution.

### B.

As a preliminary matter, the Court notes that Plaintiffs primarily assert that the policy violates the First Amendment, in that it permits expressions of faith in excess of "moments of silence." Plaintiffs' thus appear to challenge the County's prayer policy on its face. *See, e.g., John Doe #1 v. Reed*, 130 S.Ct. 2811, 2817 (2010) (holding that if the "plaintiffs' claim and the relief that would follow . . . reach beyond the particular circumstances of these plaintiffs," then a challenge is a facial challenge, even if the plaintiffs bringing the claim label it otherwise) (quotation and alteration omitted). Although efficiency normally dictates that the "usual judicial practice is to address an as-applied challenge before a facial challenge," such an approach is not practicable in

this case. See *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 327 (6th Cir. 2009) (en banc).

Plaintiffs' facial challenge to the policy requires them to scale a "steep standard of review." *Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 554 (6th Cir. 2012). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

Facial challenges to legislative acts are disfavored for several reasons, not the least of which is a consideration particularly noteworthy in this case: claims of facial invalidity often rest on speculation. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). "As a consequence, they raise the risk of premature interpretation of statutes on the basis of factually barebones records." *Id.* (quotation omitted). Further, facial challenges threaten to undermine democratic processes, in that they may frustrate the will of the people as implemented by elected representatives. *Id.* Finally, facial challenges may run afoul of judicial restraint: "courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* (quotations omitted).

Bearing this in mind, the Court cannot say that Hamilton County's prayer policy, on its face, violates the Establishment Clause.

It appears to the Court that, at least as written, the policy strives for neutrality. The policy specifically states it is not intended to "proselytize or advance any particular faith, or show any purposeful preference of one religious view to the exclusion of

27

others." (Doc. 38-1 at 4). It expressly contemplates invocations that do not constitute prayer, but instead include only "a reflective moment of silence, or a short solemnizing message." (*Id.* at 5). It does not require the participation of Commissioners or meeting attendees. (*Id.*). Additionally, it provides that: "all religious congregations with an established presence in Hamilton County" may be included on the list from which prayer-givers will be drawn, any congregation may request inclusion, and all questions of "authenticity" will be resolved by reference to the Internal Revenue Code's criteria for religious entities. (*Id.* at 6). In extending invitations to local religious leaders, the Commission will request that the speaker "maintain a spirit of respect for all," not attempt to use the opportunity to convert others, and refrain from disparaging any other faith. (*Id.* at 7).

No doubt the policy permits – and arguably even encourages – private citizens to solemnize public meetings with prayers to a divine being. Plaintiffs quite understandably recite the language oft-repeated by the Supreme Court: "[T]he First Amendment mandates governmental neutrality between religion and religion, *and between religion and nonreligion.*" *See, e.g., McCreary Cnty.*, 545 U.S. at 860 (emphasis added). It is undeniably difficult to square that language with *Marsh*'s holding, i.e., that a legislature may officially employ a Christian chaplain and endorse his practice of beginning legislative sessions with prayers to "God" offered in the "Judeo-Christian tradition." *Marsh*, 463 U.S. at 793. The Court can reach only one logical conclusion: this apparent disparity merely serves to underscore the fundamental differences between the law governing the "mainline body of Establishment Clause case law" and that governing the discrete subject of legislative prayer. *Simpson*, 404 F.3d at 281 (quoting *Snyder*, 159 F.3d at 1232). As to the latter, *Marsh* controls.

Plaintiffs have not clearly established that there is no set of circumstances under which the policy could be implemented in a way that does not offend the First Amendment. They suggest that the policy is a "sham," implying that it is merely legal cover for Hamilton County to select speakers who will inevitably advance the Christian faith. To that end, they point to the County's compilation of local congregations, the majority of which are Christian. (Doc. 38-2). At present, it would be premature and judicially improvident for the Court to predict the identity of the individuals who will be selected or the nature and character of prayers that have yet to be offered. *See Wash. State Grange*, 552 U.S. at 450. For example, the mere fact that a prayer-giver may be Christian does not necessarily mean that his or her invocations will call on Christ – a member of the Christian faith may call for a moment of silence with no more difficulty than could a Muslim, a Jew, or an atheist. Alternatively, if the Commission's practice develops into one that is inclusive of all faiths and creeds, or that represents the participation of a wide cross-section of diverse religious leaders, it can hardly be said to violate the First Amendment. *See, e.g., Galloway*, 681 F.3d at 29 ("Accordingly, our inquiry cannot look solely to whether the town's legislative prayer practice contained sectarian references. We must ask, instead, whether the town's practice, viewed in its totality by an ordinary, reasonable observer, conveyed the view that the town favored or disfavored certain religious beliefs."); *Simpson*, 404 F.3d at 284 (concluding that a policy had not "crossed the constitutional line," in part because of the county's "effort to include diverse creeds, . . . [with] a wide variety of prayers, the richness of which is quite revealing"); *Pelphrey*, 547 F.3d at 1278 ("The diversity of the religious expressions, in contrast with the prayers in the Judeo-Christian tradition allowed in *Marsh*, supports the finding that the prayers, taken as a whole, did not advance any particular faith.")

29

Plaintiffs' speculation as to invocations not yet made cannot form the basis of a successful facial challenge to prayer policy. *See id.*; *Sabri v. United States*, 541 U.S. 600, 609 (2004).

Hamilton County's prayer policy evinces no impermissible motive that may be fairly ascribed to the Commission. There is no evidence that the County seeks to use the prayer opportunity to advance one faith or disparage another. The policy's overt goals are all-inclusive, contemplating invocations offered by citizens of various creeds. In short, the policy appears on its face to foster the kind of official solemnizations that, by "harmoniz[ing] with the tenets of some or all religions," do not run afoul of the Establishment Clause. *Marsh*, 463 U.S. at 792 (quotation omitted).

To the extent Plaintiffs allege that, when applied, the prayer policy *will* violate the First Amendment, their claim is not ripe. Typically, determining whether a policy runs afoul of the Establishment Clause requires the Court to engage in "delicate and fact-sensitive inquiry." *Lee*, 505 U.S. at 597. But at this point, the factual record before the Court is far too attenuated to permit any reasoned conclusion concerning the constitutionality of the policy's application. As above, the preliminary relief Plaintiffs seek is necessarily prospective. It therefore relates to – and must be premised upon – invocations under the policy as presently written. *See Briley*, 562 F.3d at 781. The evidence before the Court concerns only two post-policy Commission meetings: those held on July 12 and July 18, 2012.[11]

This dearth of evidence – necessarily brought about by the brevity of the period between the adoption of the policy and the hearing on Plaintiffs' Motion – is drawn into

---

[11] As Plaintiffs acknowledged at the injunction hearing, the invocation used to open the July 3 meeting was said under the auspices of the prior unwritten prayer practice.

30

sharp relief when compared with the facts before other courts presented with similar questions. For example, in *Hinrichs*, the Seventh Circuit considered a prayer practice that dated back 188 years, and it reviewed over 50 individual invocations. *See Hinrichs*, 440 F.3d at 395. The plaintiffs in *Pelphrey* presented seven years' worth of legislative prayer. *See Pelphrey*, 547 F.3d at 1267. And in *Joyner*, even though a written policy was adopted mid-litigation, the Fourth Circuit was presented with a record comprising more than one year of post-policy prayers. *See Joyner*, 653 F.3d at 344.

Here, any challenge to the application of the policy or to the Commissioners' motives would be predicated on scant facts: two prayers, each of which appealed to God and to Jesus Christ. *See Sabri*, 541 U.S. at 609 (discouraging constitutional challenges "on fact-poor records"). In light of the Supreme Court's unambiguous holding in *Marsh*, legislative prayers containing references to God are constitutionally permissible. *See Marsh,* 463 U.S. at 794. Consequently, the only remaining question is whether the two prayers offered "in Jesus' name" are tantamount to the County's impermissible expression of official allegiance to Christianity. Based on the guidance of *Marsh*, *Allegheny*, and subsequent appellate cases, the Court answers in the negative. Without more, two prayers made in the name of a sectarian sacred figure (be it Christ, Muhammad, Buddha, or another) are insufficient to "symbolically place the government's official seal of approval" on the religion the holy figure represents. *Id.* at 792; *see, e.g., Galloway*, 681 F.3d at 29 ("But this does not mean that any *single* denominational prayer has the forbidden effect of affiliating the government with any one faith.") (emphasis original); *Joyner*, 653 F.3d at 354-55; *Pelphrey*, 547 F.3d at 1277-78 (upholding a finding that, even though some prayers referenced Jesus Christ, "the prayers, viewed cumulatively, did not advance a single faith . . .").

In sum, Plaintiffs have failed to establish that there is no set of circumstances under which Hamilton County's prayer policy may be implemented in a manner that comports with the First Amendment. Thus, their facial challenge to the policy fails. *See Salerno*, 481 U.S. at 745. Inasmuch as they claim the policy is unconstitutional as applied, the record before the Court is far too underdeveloped to adequately analyze their claim. While there may be a possibility for future constitutional violations under the policy, Plaintiffs have not demonstrated that they are "*likely* to suffer irreparable harm before a decision on the merits can be reached." *Winter*, 555 U.S. at 20 (emphasis added). Consequently, the Court will **DENY** their Motion for Preliminary Injunction (Doc. 16).

To be clear, the Court acknowledges two explicit conclusions that may be drawn from this Order. First, a legislative body may begin its public meetings with some type of prayer to a deity. *Marsh,* 463 U.S. at 794. Compliance with the First Amendment does not mandate that a legislature limit its invocations to nothing more than a "moment of silence." *See, e.g., id.*; *Galloway*, 681 F.3d at 33-34; *Joyner*, 653 F.3d at 354; *Pelphrey*, 547 F.3d at 1277-78. Second, the Court cannot conclude on the record before it that two prayers referencing Jesus Christ, offered by ministers at a time set aside for prayer by the Commission, constitute an impermissible affiliation of the government with Christianity.

## C.

Hamilton County urges the Court to go further. It suggests that its facially neutral prayer policy has entirely mooted any future possibility of its invocation practice violating the First Amendment. The Court cannot agree.

The Court is not prepared to hold that, through its adoption of the July 3 prayer policy, the County has permanently insulated itself from all liability for future violations of the Establishment Clause. Plaintiffs' "as-applied" challenge to the prayer policy is not yet ripe. Because there is no meaningful record of the policy's application, the Court is unable to gauge the likely success of Plaintiffs' constitutional claim, and a preliminary injunction cannot issue. Nevertheless, this litigation is not over, and eventually, a sufficient record will develop.

The County argues that "*Marsh* clearly approved legislative prayers that are explicitly Christian," suggesting that subsequent conflicting "dicta" should be disregarded. Put generously, the County's reading of *Marsh* is strained. First, in *Marsh* itself, the Court took pains to note that although the prayers at issue were offered "in the Judeo-Christian tradition," the chaplain "removed all references to Christ" after a legislator complained. *Marsh*, 463 U.S. at 793 n.14. It also suggested at least that an inquiry into the content of legislative prayers may be appropriate when evidence demonstrates that the prayers advance one religion, disparage another, or proselytize the audience. *Id.* at 794-95.

Moreover, the County disregards the Supreme Court's own subsequent interpretation of *Marsh*, which it announced in *Allegheny*. There, the Court stated that even the unique history of legislative prayers does not allow them to "have the effect of affiliating the government with any one specific faith or belief. . . . The legislative prayers involved in Marsh did not violate this principle because the particular chaplain had removed all references to Christ." *Allegheny*, 492 U.S. at 603. As noted above (*see* FN 7, *supra*), the County is incorrect in characterizing *Allegheny's* discussion of *Marsh* as Justice Blackmun's "plurality opinion." In stating that "government may not

33

demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions)," Justice Blackmun did more than merely speak for himself – he announced the opinion of the United States Supreme Court. Even assuming the statements are dicta, they plainly post-date *Marsh*, and they are no less binding on this Court. *See, e.g., Murray v. U.S. Dep't of Treasury*, 681 F.3d 744, 751 n.5 (6th Cir. 2012) ("Lower courts are obligated to follow Supreme Court dicta, particularly where there is not substantial reason for disregarding it, such as age or subsequent statements undermining its rationale.") (quotation omitted).

At this stage of the litigation, at least, the Court is not prepared to accept that, after *Marsh*, a legislative body may uniformly open meeting after meeting with explicitly Christian prayers without facing some constitutional scrutiny. At the very least, that is a proposition called into question by *Allegheny* and explicitly rejected by several courts of appeal. *See, e.g., Allegheny*, 492 U.S. at 602-06, *Galloway*, 681 F.3d at 31-32; *Joyner*, 653 F.3d at 353-54; *Hinrichs*, 440 F.3d at 398-402. Indeed, in an en banc opinion, the Sixth Circuit has implied that the constitutional permissibility of a legislative prayer may be tied in part to its nonsectarian character. *Americans United*, 980 F.2d at 1544.

The County argues that the Supreme Court's holding in *Lee* renders it constitutionally unable to regulate what prayers are offered at its meetings. It further argues that, in any event, "the impossibility of determining what language is 'sectarian' may render the issue nonjusticiable." (Doc. 63 at 3). These issues are not before the Court at this stage of litigation. However, two brief observations are warranted. First, at least one court of appeals has flatly rejected the County's argument that *Lee* restricts its ability to regulate the character of prayers offered at Commission meetings: "We do

34

not read *Lee* as holding that a government cannot require legislative prayers to be nonsectarian. Instead, *Lee* established that government cannot compel students to participate in a religious exercise as part of a school program." *Turner*, 534 F.3d at 355. Second, of all the cases to address legislative prayer, Hamilton County has identified none that raise meaningful questions of non-justiciability.[12]

It is not the role of this Court, or of any other court, to craft a constitutionally acceptable policy concerning legislative prayer at Hamilton County Commission meetings.[13] *See* U.S. Const. art. III, § 2. That responsibility rests – as it should – solely with the Commission, which is comprised of the elected representatives of the people of Hamilton County. There appears to the Court to be a continuum of options from which policymakers may choose when crafting such a policy. It includes: (1) permitting no prayer whatsoever; (2) allowing for only a reflective moment of silence; (3) permitting ecumenical, nondenominational prayers of the kind found acceptable in *Marsh*; or (4)

---

[12] The burden of distinguishing between "sectarian" and "non-sectarian" prayers may be less insurmountable than the County would suggest. Many Courts to have confronted the issue – including those cited by the County – have reached a conclusion concerning the meaning of such classifications. *See, e.g., Galloway*, 681 F.3d at 28 ("[T]he distinction between sectarian and nonsectarian prayers merely serves as a shorthand, albeit a potentially confusing one, for the prohibition on religious advancement or affiliation outlined in *Marsh* and *Allegheny*.").

[13] On this point, the Second Circuit summarized:

> It is true that contextual inquiries like this one can give only limited guidance to municipalities that wish to maintain a legislative prayer practice and still comply with the mandates of the Establishment Clause. As the foregoing indicates, a municipality cannot – in our judgment – ensure that its prayer practice complies with the Establishment Clause simply by stating, expressly, that it does not mean to affiliate itself with any particular faith. Nor can a municipality insulate itself from liability by adopting a lottery to select prayer-givers or by actively pursuing prayer-givers of minority faiths whose members reside within the town. Similarly, there is no substantive mixture of prayer language that will, on its own, necessarily avert the appearance of affiliation. Ultimately, municipalities must consider their prayer practices in context and as a whole. A municipality must ask itself whether what it does, in context, reasonably can be seen as endorsing a particular faith or creed over others. That is the delicate balancing act required by the Establishment Clause and its jurisprudence.

*Galloway*, 681 F.3d at 33 (footnotes omitted).

authorizing some denominational prayer while taking care to ensure that its public recitation does not proselytize listeners, advance one religion or disparage another, or otherwise affiliate the government with any specific faith. No one option is constitutionally mandated to the exclusion of the others.

The Commission has chosen the fourth of these four options, and it is entirely within its rights to do so. However, in so choosing, it has assumed – on its own behalf and on behalf of the citizens and taxpayers of Hamilton County – the responsibility of ensuring that its policy is implemented in a manner that respects both the rights of its citizens and the commands of the First Amendment. Whether it will actually effect its policy in such a fashion has yet to be seen.

### D.

Having disposed of Plaintiffs Motion for Preliminary Injunction, litigation will proceed on the merits of Plaintiffs' Complaint. Thus, the Court will **ORDER** the parties to appear in chambers for a scheduling conference, to be conducted at **11:00 a.m.** on **October 2, 2012.**

The Court recognizes that this Order may be immediately appealable as of right pursuant to 28 U.S.C. § 1292(a)(1). *See, e.g., Freeman v. Helldoerfer*, 208 F.3d 213 (table), 2000 WL 125885 at *1 (6th Cir. Jan. 28, 2000) ("While a party generally can only appeal a district court order ending the litigation, [a court of appeals] has jurisdiction to consider an appeal from the denial of a preliminary injunction under 28 U.S.C. § 1292(a)(1)."). Should a party elect to appeal this Order, the scheduling conference will be canceled.

IV.

Accordingly, and for the reasons stated, Plaintiffs' Motion for Preliminary Injunction (Doc. 16) is hereby **DENIED**.

The parties are **ORDERED** to appear in chambers for a scheduling conference at **11:00 a.m.** on **October 2, 2012.** If a party elects to appeal this Order to the United States Court of Appeals for the Sixth Circuit, that conference will be canceled.

**SO ORDERED** this 29th day of August, 2012.

_____/s/ Harry S. Mattice, Jr._____

HARRY S. MATTICE, JR.

UNITED STATES DISTRICT JUDGE
