UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

THOMAS JOSEPH COLEMAN, III and ) 
BRANDON RAYMOND JAMES, )
)
*Plaintiffs*, )
) Case No. 1:12-cv-190
v. )
) Judge Mattice
HAMILTON COUNTY, TENNESSEE, )
)
*Defendant.* )
)

## ORDER

Before the Court is Defendant Hamilton County, Tennessee's ("Hamilton County") Motion for Summary Judgment (Doc. 83). For the reasons stated herein, the Court will **GRANT IN PART** and **DENY IN PART** Defendant's Motion. (Doc. 83). Plaintiffs' claims arising under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the U.S. Constitution will be **DISMISSED WITH PREJUDICE**. Plaintiff Coleman's federal and state law claims arising out of his seizure at the July 12, 2012 County Commission Meeting will **PROCEED TO TRIAL**.

## I. BACKGROUND & FACTS

For the purposes of summary judgment, the Court will view the facts in the light most favorable to Plaintiff. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, many facts in this case are undisputed, and certain facts have previously been stipulated to by both parties. (*See* Doc. 38; Doc. 84 at 5-6; Doc. 89).

### *Prayer Policy*

Hamilton County is a political subdivision of the State of Tennessee, and the Commission is its elected legislature and final policymaker. (Doc. 38 at 1). The Commission conducts the County's business during its regularly scheduled public meetings. (*Id.*).

On July 3, 2012, the Commission adopted Resolution 712-13, entitled "A Resolution Adopting a Policy Regarding Opening Invocations Before Meetings of the Hamilton County Commission" ("the prayer policy" or "the policy").[1] (Doc. 38-1). The resolution is nine pages in length, and it contains approximately five pages of preamble, in which various clauses set forth, *inter alia*, the Commission's intention to "invoke divine guidance"; quotes from Supreme Court and federal appellate cases concerning the constitutionality of legislative prayer; and the resolution's goal of adopting a policy that does not "proselytize or advance any particular faith, or show any purposeful preference of one religious view to the exclusion of others." (*Id.* at 1-5).

The policy permits "an eligible member of the clergy in Hamilton County, Tennessee," to give an invocation at the opening of Commission meetings. (*Id.* at 5). The invocation speakers are drawn from a list of "all the religious congregations with an established presence in Hamilton County," compiled based on local listings for religious institutions found within the Yellow Pages. (*Id.*; Doc. 89-5 at 2-3). Although the substantial majority of the congregations on the list are Christian churches, institutions representing Muslim, Jewish, and Baha'i faiths, as well as others, are also included.[2]

---

[1] Resolution 712-13 expressly repealed and replaced any prior practices concerning opening invocations at Commission meetings. (Doc. 38-1 at 5).

[2] Plaintiffs repeatedly note that Wiccans, Satanists, and Covens are not included on the list; however, they have presented no evidence that any such congregations had an established presence in the County.

(Doc. 38-2; Doc. 89-7 at 8, 12; Doc. 83-1 at 4; Doc. 83-2 at 3). If an institution is not represented on the list, it may request inclusion in writing, with any dispute as to an organization's religious *bona fides* being resolved by reference to the Internal Revenue Code's guidelines for tax-exempt status.[3] (Doc. 38-1 at 6).

The Commission does not engage in any content review of the invocations, and it places no guidelines on what may be said, except: "[T]he Commission requests that no invocation should proselytize or advance any faith, disparage the religious faith or non-religious views of others, or exceed five minutes in length." (Doc. 38). To that end, the policy dictates the contents of the invitation letter that is mailed to religious leaders. (Doc. 38-1 at 7-8). It states that:

> This opportunity is voluntary, and you are free to offer the invocation according to the dictates of your own conscience. However, please try not to exceed no [sic] more than five (5) minutes for your presentation. To maintain a spirit of respect for all, the Commission requests only that the opportunity not be exploited as an effort to convert others to the particular faith of the invocation speaker, nor to disparage any faith or belief different than that of the invocation speaker.

(*Id.* at 7). Additionally, Commission agendas include the following printed language:

> *Any invocation that may be offered before the official start of the Commission meeting shall be the voluntary offering of a private citizen, to and for the benefit of the Commission. The views or beliefs expressed by the invocation speaker have not been previously reviewed or approved by the Commission and do not necessarily represent the religious beliefs or views of the Commission in part or as a whole. No member of the community is required to attend or participate in the invocation and such decision will have no impact on their right to actively participate in the business of the Commission.*

(*Id.* at 8) (emphasis original).

Religious leaders notify the Commission of their willingness to offer an invocation via reply letter. (*Id.* at 7-8). The policy provides that religious leaders will

---

[3] Additionally, a resident of the County who attends a congregation outside of the County may make a request for the inclusion of their congregation on the list.

then be scheduled to give an invocation at upcoming Commission meetings on a "first-come, first-serve basis." (*Id.* at 8; Doc. 83-1 at 4; Doc. 83-2 at 4).

Since the adoption of the policy, religious leaders of various congregations – including Baptist, Lutheran, Church of God, Presbyterian, Jewish, and Unitarian Universalist – have volunteered to be placed on the County's agenda as the invocation speaker. (Doc. 38). The County has granted every request for inclusion on the invocation schedules from representatives of qualified assemblies. (Doc. 83-1 at 5; Doc. 83-2 at 4). Many of the invocation speakers have offered prayers referencing their faith tradition, the majority of which represent Christian traditions. (Doc. 83-1 at 6-7; Doc. 83-2 at 6). None of the speakers, however, has offered an invocation which denigrates minority faiths or nonbelievers, threatens damnation, or preaches conversion to a particular faith. (Doc. 83-1 at 6-7; Doc. 83-2 at 6).

In November 2012, a few months after creation of the congregations list, Plaintiff Coleman requested that he be added to the invitation list and scheduled to deliver an invocation. (Doc. 83-1 at 7-8; Doc. 89-3 at 3-6). The County asked for the name and address of the assembly in order to send an invitation. (Doc. 83-1 at 7-8; Doc. 89-3 at 3-6). Plaintiff replied "I do not represent any religious assembly or congregation . . . I am not a clergyman . . . I have no address to give you . . . [and] I do not have 501(c)(3) tax-exempt status."[4] (Doc. 83-1 at 7-8; Doc. 89-3 at 3-6). There is no dispute that Plaintiff Coleman was never added to the invitation list or scheduled to give an invocation.

---

[4] The parties have presented different versions of the facts after this point. According to Plaintiff, he asked the County for suggestions as to how to proceed after he informed it that he was not a clergyman and did not represent any religious assembly, and the County never responded to him again. According to the County, it responded to Plaintiff by letter stating that "[n]o qualifying congregation/assembly will be excluded from the 'congregations list' based on the religious perspective of the organization, even religious perspectives that do not teach what would generally be considered a belief in the existence of God," and setting forth the criteria for a qualifying congregation/assembly. The County further maintains that Plaintiff responded to this letter, asking if his request was being denied, to which the County replied

*July 12, 2012 Commission Meeting* [5]

On July 12, 2012, Plaintiff Coleman and Aaron Moyer (who is not a party to this action) attended a Commission meeting that was open to members of the public. (Doc. 89-1 at 1; Doc. 89-3 at 1). According to the Commission, it sets aside 10 minutes for public comments at its meetings, and when multiple persons wish to speak, the Commission will limit individual speakers to 3 minutes in order to hear from a variety of citizens.[6] (Doc. 83-1 at 8-9). Moyer was the second person to speak during the public comments portion of the meeting on July 12, 2012; two other citizens were waiting to speak after Moyer. (*Id.* at 9).

After approximately four and a half minutes, Larry Henry, Chairman of the Commission, can be heard on the video informing Moyer that his time was nearly expired and asking Moyer to "wrap it up."[7] (*Id.*; Doc. 89-1 at 1; Doc. 89-3 at 1). Moyer can be heard on the video continuing to speak for approximately a minute and a half, at which point Henry said "Sir, I am going to have to ask you to wrap it up. We need to move on. We've got two more." Moyer did not stop, however, but continued speaking.

"No, not necessarily . . . we could not tell if you are part of a qualifying congregation/assembly. If you affirm that you are and provide the name and address of the organization, the invitation will be extended." The County contends that Plaintiff never responded to that correspondence.

[5] Plaintiffs have submitted a video recording from the July 12, 2012 Commission meeting. Although the video neither confirms nor refutes, as a whole, either party's account of the events at the July 12, 2012 meeting, the Court has nonetheless viewed the video and will consider it in assessing the merits of Defendant's Motion. The Court will note, where applicable, which facts are readily discernible from the video and therefore "undisputed."

[6] According to Coleman and Moyer, they were never notified that they had less than 10 minutes to speak when they attended a public meeting to make comments. Moyer notes in his affidavit that he has seen one other individual address the Commission "for nearly ten minutes" without interruption; however, Moyer has not made any declaration as to whether other individuals were waiting to speak during the public comment period at those times. (Doc. 89-1). This assertion, without more, is insufficient to refute the County's evidence that they had a policy of allowing only 10 minutes for public comments, and that speakers time was further limited when multiple citizens wish to make such comments.

[7] It is not clear from the video that Henry is the Commissioner speaking; however, the parties have agreed that Henry was the Commissioner speaking to Moyer throughout the course of this incident.

Henry asked Moyer to sit down. When Moyer refused to sit down and raised his voice, Henry can be heard asking security to "escort this gentleman to his seat."

After Moyer returned to his seat, a female deputy approached Moyer and Coleman. (Doc. 89-1 at 2; Doc. 89-3 at 2). She is briefly seen on camera, standing by Moyer's seat, before the recording focuses on the next speaker. At this point, it sounds as though Moyer and Coleman may be having a conversation with the deputy; however, the conversation is not audible on the video. According to Moyer and Coleman, the Commissioners were making gestures indicating that they should be removed from the meeting; Moyer also averred that one of the Commissioners told the deputy to "get them out of here." (Doc. 89-1 at 2; Doc. 89-3 at 2). The County maintains that none of the Commissioners asked the deputy to remove Moyer or Coleman from the room. (Doc. 83-1 at 10). The County maintains that, while the deputy was dealing with Moyer, Coleman asked the deputy: "Me too?" (*Id.*). The deputy indicated yes and proceeded to escort Coleman and Moyer out of the room. (*Id.*). Coleman maintains that he did not ask, "Me too?" and was still removed from the meeting room. (Doc. 89-3 at 2).

Coleman can be seen on the video standing up while stating, "I'm now being forced to leave, and I have done nothing wrong." The video then shows Coleman walking freely towards the exit door of the Commission chambers, which is being held open by the female deputy. Coleman can then be seen walking out of the Commission chambers, past the deputy and into the lobby, at which point he states, "this is Tommy Coleman and Aaron Moyer, who have been asked to leave. I can't speak for Aaron, but I, myself, have done absolutely nothing to be asked to leave." After Moyer and Coleman have exited into the lobby, the deputy is seen closing the door to the Commission

chambers; she then takes a seat inside the chambers, facing towards the Commissioners and away from the door that Moyer and Coleman have exited.

### *The Instant Lawsuit*

Plaintiffs filed this action on June 15, 2012, and their first Amended Complaint on June 29, 2012, both prior to the official enactment of the prayer policy and prior to the incident at the July 12, 2012 meeting. (Docs. 1, 20). In their Second Amended Complaint, filed immediately following the July 12, 2012 meeting, Plaintiffs claim that Defendant violated their rights under the Establishment Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. (Doc. 27 at 8). Plaintiff Coleman also claims that he was unlawfully seized in violation of the Fourth Amendment, and that Defendant's actions constituted assault and negligence under Tennessee common law. (*Id.* at 1, 8). Defendant has now moved for summary judgment as to Plaintiffs' federal claims – that is, the First Amendment claim asserted by both Plaintiff's and the Fourth Amendment seizure claim asserted by Coleman.[8] (Doc. 83).

## II.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the presence or absence of genuine issues of material facts must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine

---

[8] Defendant has not moved for summary judgment as to Plaintiff Coleman's state law claims.

dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). As previously noted, when ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586; Fed. R. Civ. P. 56). The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248-49 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475-76 (6th Cir. 2010). A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374. If the nonmoving party fails to make a sufficient showing

on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## III.  ANALYSIS

### A.  Constitutional Claims arising under the First Amendment

#### 1.  *Free Speech Clause*

The Federal Rules of Civil Procedure provide that all pleadings must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2).  At a minimum, Rule 8(a) requires the plaintiff to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]" *Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 556 n.3 (2007).

In their response to Defendant's instant Motion and at the oral argument on Defendant's Motion, Plaintiffs raise the issue of prior restraint on free speech; however, Plaintiffs' Second Amended Complaint neither referenced the Free Speech Clause of the First Amendment nor included any factual allegations suggesting that Plaintiffs sought to raise such a challenge.[9]  Plaintiffs further failed to raise any Free Speech Clause issue while litigating their Motion for Preliminary Injunction in this Court and in the United States Court of Appeals for the Sixth Circuit.  By declining to reference the Free Speech Clause at any point prior to their response to Defendant's Motion for Summary Judgment, Plaintiffs failed to give Defendant adequate notice that they intended to pursue such a claim.  Plaintiffs failed to file a motion to amend their Complaint to add such a claim before the deadline for requesting leave to amend, or at any time thereafter.  The Court thus finds that Plaintiffs have failed to assert a claim for violations

---

[9] Plaintiffs' Second Amended Complaint specifically invokes only the Establishment Clause of the First Amendment.  (Doc. 27 at 1, 8).

of the Free Speech Clause of the First Amendment and that this action – which has been ongoing for two and a half years – has advanced well beyond the stage at which the pleadings could or should be amended. The Court will accordingly disregard Plaintiffs' arguments regarding the Free Speech Clause.[10]

## 2. Establishment Clause

Plaintiffs' First Amendment claim is a legislative prayer challenge. "As practiced by Congress since the framing of the Constitution, legislative prayer lends gravity to public business, reminds lawmakers to transcend petty differences in pursuit of a higher purpose, and expresses a common aspiration to a just and peaceful society." *See Town of Greece, NY v. Galloway*, 134 S.Ct. 1811, 1818 (2014). Legislative prayer is a peculiar subspecies of government conduct implicating the Establishment Clause of the First Amendment, in that it is both religious in nature and "long . . . understood as compatible with the Establishment Clause." *Id.* at 1818-19; *see, e.g., Joyner v. Forsyth Cnty.*, 653 F.3d 341, 345 (4th Cir. 2011) ("[T]his is not a case about the Establishment Clause in general, but about legislative prayer in particular."); *Snyder v. Murray City Corp.*, 159 F.3d 1227, 1232 (10th Cir. 1999) (en banc) ("[T]he evolution of Establishment Clause jurisprudence indicates that the constitutionality of legislative prayers is a *sui generis* legal question."). The United States Supreme Court has explained this apparent paradox by noting that

> in light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an "establishment" of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country.

---

[10] The Court notes that, even if such a claim had been pled, it would fail for the reasons discussed in Subsection B, *infra*.

*Marsh v. Chambers*, 463 U.S. 783, 792 (1983) (citing *Zorach v. Clauson*, 343 U.S. 306, 313 (1952)); *Greece*, 134 S.Ct. at 1819 ("*Marsh* stands for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted.").

Legislative prayer policies have previously been sustained without scrutiny under the sorts of formal tests that are typically used in the analysis of Establishment Clause claims. *See, e.g.*, *Greece*, 134 S.Ct. at 1818; *Marsh*, 463 U.S. at 796, 813 (finding no First Amendment violation in the Nebraska Legislature's practice of opening its sessions with a prayer delivered by a Presbyterian chaplain, who was paid with state funds, because there was no evidence that the practice stemmed from an impermissible motive and because the prayers given by the chaplain were not used to advance or disparage any particular faith or belief). Instead, federal courts have looked more generally at whether legislative prayer policies and practices are based on impermissible motives or are used to advance one faith or belief over another.

The United States Court of Appeals for the Sixth Circuit has previously reviewed the County's legislative prayer policy under the Establishment Clause of the First Amendment, in connection with Plaintiffs' previously filed motion for a preliminary injunction. On July 19, 2013, the Sixth Circuit expressly held that Hamilton County's prayer policy is facially constitutional. *Jones v. Hamilton Cnty. Gov't, Tenn.*, 530 F. App'x 478, 487-90 (6th Cir. 2013) ("Here, the Policy is facially constitutional. The Policy aims to respect the diversity of all religious groups, and it does not seek to advance one faith or belief over another. The Policy is similar to other policies that have been recognized as facially neutral by our sister circuits. Indeed, not one of our sister circuits

that have addressed this same issue have struck down a legislature's policy as facially unconstitutional." (internal citations omitted)).

The Sixth Circuit declined to address Plaintiffs' as-applied challenge, noting that it was not yet ripe. *Id.* at 490. Nonetheless, the Court noted that "[w]ithout the ability to establish basic criteria for selecting religious groups to participate in the prayer invocations, the Commission would be unable to ensure that speakers are members of bonafide religious organizations, as opposed to commercial entities or other groups with missions completely unrelated to the Commission's practice of solemnizing its meetings with an invocation." *Id.* at 488-89.

Then, on May 5, 2014, the Supreme Court of the United States issued its opinion in *Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811 (2014). The facts of *Greece* are similar to the facts presented in this case. The Town of Greece followed an informal method for selecting a clergyman to provide an invocation during town board meetings.[11] *Id.* at 1816. To select a clergyman to provide an invocation, a town employee would call congregations listed in a local directory until she found a minister available for that month's meeting. *Id.* The town eventually compiled a list of willing "board chaplains" who had accepted previous invitations and agreed to return in the future. *Id.* Town leaders maintained that a minister or layperson of any persuasion, including atheist, could give the invocation, but nearly all of the congregations in town were Christian. *Id.* Respondents Susan Galloway and Linda Stephens objected that the

---

[11] At oral argument, Plaintiffs argued that the County's prayer practice was distinguishable from that in *Greece* and ran afoul of the Establishment Clause because the invocations are given after the opening gavel and after the the Commission was called to order for official business. (Doc. 105 at 32-35). However, in *Greece*, the invocation was given "[f]ollowing the roll call and recitation of the Pledge of Allegiance." *Galloway*, 134 S.Ct. at 1816. The Court finds the County's practice of allowing opening invocations after the opening gavel to be constitutionally permissible under the analysis in *Greece*; further, the Court finds any distinction between prayers offered before or after an opening gavel at a legislative meeting to be artificial and immaterial to a constitutional inquiry.

prayers offered at the board meetings violated their religious beliefs and philosophical views.  *Id.* at 1817.  After Galloway and Stephens complained that Christian themes pervaded the prayers to the exclusion of citizens who did not share those beliefs, the town invited a Jewish layman, the chairman of the local Baha'i temple and a Wiccan priestess to deliver prayers.  *Id.*

Galloway and Stephens filed suit requesting an injunction requiring the town to limit prayers to "inclusive and ecumenical" prayers that referred only to a "generic God" that would not associate the Government with any one faith or belief.  *Id.*  Specifically, Galloway and Stephens argued that any prayer offered at the town meetings must be "nonsectarian, or not identifiable with any one religion."  *Id.* at 1820.

The Supreme Court held that the town's prayer practices did not violate the First Amendment.  The Supreme Court explained that "an insistence on nonsectarian or ecumenical prayer as a single, fixed standard is not consistent with the tradition of legislative prayer" outlined in cases like *Marsh* and that the constitutionality of prayer does not turn on the neutrality of its content.[12]  *Id.*  Although the Supreme Court held that the First Amendment does not require legislative prayer to be nonsectarian, it did hold that certain restraints remain:

> If the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion, many present may consider the prayer to fall short of the desire to elevate the purpose of the occasion to unite lawmakers in their common effort.  That circumstance would present a different case than the one presently before the Court. . . . Prayer that reflects beliefs specific to only some creeds can still serve to solemnize the occasion, so long as the

---

[12] The Supreme Court further explained that "[t]o hold that invocations must be nonsectarian would force the legislatures that sponsor prayers and the courts that are asked to decide these cases to act as supervisors and censors of speech, a rule that would involve government in religious matters to a far greater degree than is the case under the town's current practice of neither editing or approving prayers in advance nor criticizing their content after the fact."  *Galloway*, 134 S.Ct. at 1822.

practice over time is not exploited to "proselytize or advance any one, or to disparage any other, faith or belief."

*Id.* at 1823. (*quoting Marsh*, 463 U.S. at 794-95). Accordingly, in further defining the parameters of constitutionally permissible legislative prayer, the Supreme Court explained that "[a]bsent a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose, a challenge based solely on the content of prayer will not likely establish a constitutional violation." *Id.* at 1824.

Galloway and Stephens also argued that the town of Greece contravened the Establishment Clause by inviting a predominantly Christian set of ministers to lead prayer. *Id.* The Supreme Court disagreed, holding that "[t]he town made reasonable efforts to identify all congregations within its borders and represented that it would welcome a prayer by any minister or layman who wished to give one." *Id.* The Supreme Court explained that "[s]o long as the town maintains a policy of nondiscrimination, the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing. The quest to promote a diversity of religious views would require the town to make wholly inappropriate judgments about the number of religions [it] should sponsor and the relative frequency with which it should sponsor each, a form of government entanglement with religion that is far more troublesome than the current approach." *Id.* (internal quotation marks and citations omitted).

It is against this legal backdrop that the Court considers Defendant's Motion for Summary Judgment as to Plaintiffs' Establishment Clause claim, both facially and as-applied. The County argues that the undisputed facts demonstrate: (1) that participation in prayer at Commission meetings is voluntary and not coerced; (2)

selection to give an invocation at Commission meetings is nondiscriminatory and is not dependent on the faith of the prayer giver; and (3) the content of the prayers do not exhibit a pattern over time that denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion. Accordingly, they argue that the policy is constitutional under the standards set forth in *Greece*, and that the policy as written and as implemented complies with the criteria established by the Supreme Court.[13]

Plaintiffs argue that Hamilton County's prayer policy is unconstitutional because "implementation of the policy reveals the pre-textual nature of the policy[.]" Although not entirely clear from Plaintiffs' response brief, it appears that Plaintiffs' primary argument is that the Policy is unconstitutional because it requires invocation givers to be part of an eligible and established assembly or congregation and makes no provision for individuals who wish to give an invocation. In arguing that the Policy is "pre-textual," Plaintiffs take issue with certain aspects of the Policy and its implementation, such as that (1) "the policy does not set forth any test with a proven record to make the determination of just what constitutes eligible and established congregations"; (2) although the Policy requires invocations to happen before the start of official business, on November 29, 2012, a citizen was permitted to give an invocation after the Chairman

---

[13] Defendant also moved for summary judgment as to any claim that prayers delivered before the adoption of the official Policy on July 12, 2013 violated the First Amendment. However, Plaintiffs' response to Defendant's Motion does not include any argument regarding invocations offered prior to July 12, 2013. Accordingly, the Court finds that Plaintiff has abandoned any argument or claim regarding the constitutionality of the prayers or invocations offered at the County's commission meetings prior to July 12, 2103. *See, e.g., Clark v. City of Dublin, Oh.*, 178 F. App'x 522, 524-25 (6th Cir. 2006) (finding that, when a plaintiff did not properly respond to arguments asserted by a defendant's motion for summary judgment as to two claims, "the District Court did not err when it found that the Appellant abandoned [those] claims"); *Conner v. Hardee's Food Sys., Inc.*, 65 F. App'x 19 (6th Cir. 2003) (finding that the plaintiffs had abandoned their claim "[b]ecause [they] failed to brief the issue before the district court"); *Anglers of the Au Sable v. United States Forest Svc.*, 565 F. Supp. 2d. 812, 839 (E.D. Mich. 2008) ("It is well settled that abandonment may occur where a party asserts a claim in its complaint, but then fails to address the issue in response to an omnibus motion for summary judgment."); *see also Morris v. City of Memphis*, 2012 WL 3727149, at *2 (W.D. Tenn. Aug. 27, 2012) (collecting cases).

called the meeting to order; (3) the Policy "allows too much power in the hands of the Commission" which can "weed out" individuals by "arbitrary Q&A"; and (4) one citizen was permitted to give an invocation despite not being a member of an "established" congregation. Based on these considerations, Plaintiffs conclude that "[i]n light of the refusal to allow Coleman to give an invocation at all, and the overwhelmingly Christian representation of 'invocation givers' . . . this Court cannot help but determine the 'policy' is a pretext to exclude *individuals* of all walks of life to address the defendant through its Commission and to ensure that the majority of 'eligible' members are wholly Christian."

### a. Facial Challenge

Facial challenges are generally disfavored as "[1] they 'often rest on speculation' and thus 'raise the risk of premature interpretation,' [2] they 'run contrary to the fundamental principle of judicial restraint,' and [3] they 'threaten to short circuit the democratic process.'" *Green Party of Tenn. v. Hargett,* 700 F.3d 816, 826 (6th Cir. 2012) (quoting *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 450–51, (2008)). "Facial invalidation is strong medicine that is not to be casually employed." *Ohio Citizen Action v. City of Englewood,* 671 F.3d 564 (6th Cir. 2012) (internal quotation marks omitted)

Plaintiffs' response in opposition to Defendant's instant Motion does not appear to challenge the County's prayer policy on its face. Nonetheless, the Court notes for the record that the County's policy is facially constitutional. The Sixth Circuit has already ruled upon the facial constitutionality of this exact policy, noting that it "aims to respect the diversity of all religious groups, and it does not seek to advance one faith or belief over another." The Supreme Court reiterated in *Greece* that a legislative prayer policy does not have to require sectarian prayers, nor does a legislative body have to act as

"supervisors or censors" of such prayers. Indeed, *Greece* confirmed that legislative prayer policies may be constitutional even if all of the speakers are of the same religion so long as there is no "pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose[.]"

The County's policy, on its face, does not advance one religion over another; it allows for invocations from a variety of faiths and allows for prayers with religious references, but has not led to denigration or proselytizing. The County does not involve itself in the content of the prayers offered and has allowed speakers from assemblies representing a variety of faith traditions. In fact, the County has never rejected a request to be added to the invocation schedule from an eligible member of the clergy under the policy. Thus, under the standards set forth in *Greece*, the County's legislative prayer policy is constitutional, and any facial challenge to said policy thus fails.

### b. As-Applied Challenge

In their response in opposition to Defendant's Motion for Summary Judgment and at oral argument, Plaintiffs primarily argued that Defendant's implementation of their prayer policy violated the First Amendment. Specifically, Plaintiffs have argued that the County applies the policy in a manner so as to "deny[] the right of the individual to address the government body."[14] (Doc. 105 at 24-30). When specifically asked by the

---

[14] The arguments made by Plaintiffs' counsel at the oral argument on Defendant's Motion demonstrate that Plaintiffs have a confused view of the protections afforded by, and interplay between, various amendments to the U.S. Constitution, and the clauses contained therein. For example, in arguing how the Defendant's legislative prayer policy has been applied in a manner that violates the Establishment Clause of the First Amendment, Plaintiffs' counsel argued that Defendant was "violat[ing] the individual's right to equal protection to address their government actor, and to have a [free] speech aspect because that what the flavor of this is because when we're giving a prayer you're actually providing a forum." (*See* Doc. 105 at 25-26). As discussed in Subsection B, *infra*, the Equal Protection Clause of the Fourteenth Amendment and the Free Speech Clause of the First Amendment are not implicated in legislative prayer cases; indeed, even other Establishment Clause precedent is not applicable in such cases. Thus, despite Plaintiffs' arguments to the contrary, the Court does not believe that it's analysis of Plaintiffs' as-applied

Court whether "each and every [American] posses[es] an individualized right to address a prayer to a session of Congress," Plaintiffs' counsel responded "I would say so." (*Id.* at 26).

Plaintiffs' argument is clearly flawed and flies in the face of established Supreme Court precedent. In *Marsh*, the Supreme Court expressly authorized legislative bodies to appoint and retain a single person to give invocations at the beginning of official meetings. To find that each and every individual person under the jurisdiction of a particular legislative body has the right to give an opening prayer or invocation at the body's meetings would effectively overrule not only *Marsh*, but an entire body of federal case law approving of the constitutionality of chaplains and non-discriminatory legislative prayer policies.

Plaintiffs have repeatedly conflated the protections of the Free Speech Clause of the First Amendment with those provided by the Establishment Clause. But Plaintiffs have brought suit implicating the doctrine of legislative *prayer*, not legislative *speech*. Implicit in the body of federal case law on legislative prayer – which all repeatedly emphasize that legislative prayer is somehow different than other Establishment Clause cases – is the understanding the government may favor religion over nonreligion in this narrow circumstance. Prayer, by its very definition, is religious in nature. *See* The American Heritage Dictionary of the English Language 35, 1379 (4th ed. 2000) (defining prayer as "[a] reverent petition made to God, a god, or another object of worship."). Thus, while legislative bodies cannot intentionally discriminate against particular faith systems, they can require that invocation givers have some religious credentials. *See Center for Inquiry, Inc. v. Marion Circuit Court Clerk*, 758 F.3d 869, 874 (7th Cir.

---

challenge to Defendant's legislative prayer policy should be "flavored" with considerations of other portions of the U.S. Constitution.

2014) ("[N]either [*Marsh* nor Greece] can be divorced from its context. Both concern the long-established practice of opening legislative meetings with prayer. That is to say, they concern what a chosen agent of the government says as part of the government's own operations. . . . *Marsh* and *Greece* show that a government may, consistent with the First Amendment, open legislative sessions with Christian prayers while not inviting leaders of other religions . . . ."); *Pelphrey v. Cobb Cnty., Ga.*, 547 F.3d 1263, 1281 (11th Cir. 2008) (noting that the *Marsh* "does not require that all faiths be allowed the opportunity to pray. The standard instead prohibits purposeful discrimination."). Indeed, the Sixth Circuit has already determined as much in this very case, noting that the County had an interest in "establish[ing] basic criteria for selecting religious groups to participate in the prayer invocations . . . [in order to] ensure that speakers are members of bonafide religious organizations, as opposed to commercial entities or other groups with missions completely unrelated to the Commission's practice of solemnizing its meetings with an invocation."

Plaintiffs have failed to present to the Court any evidence or argument that Defendant's prayer policy is implemented in a way that discriminates against particular faith systems, either intentionally or unintentionally. Their argument that the policy discriminates against each and every individual who is not an eligible member of the clergy affiliated with a bona fide religious assembly simply has no basis under current legislative prayer jurisprudence.[15] The Court accordingly finds that Defendant's prayer

---

[15] In their response in opposition to Defendant's instant Motion, Plaintiffs devote substantial discussion to an incident wherein a man named Eddie Bridges was permitted to give an invocation to the Commission, despite the fact that he was not an eligible clergyman affiliated with a religious assembly. The Court finds this incident to be of little to no import in its instant analysis. Bridges, by his own admission, was vague regarding his religious affiliation when discussing his inclusion on the invocation list with County officials. Additionally, the fact that Bridges was permitted to give an invocation despite his lack of eligibility demonstrates that the County has made every effort to be inclusive and avoid religious discrimination in implementing its prayer policy. It does not, as Plaintiffs argue, demonstrate that the

19

policy is constitutional as applied, and Defendant's Motion for Summary Judgment as to Plaintiffs' Establishment Clause claim will be **GRANTED**.

### B.    Equal Protection

In their Second Amended Complaint and their Response in Opposition to Defendant's Motion for Summary Judgment, Plaintiffs make vague references to violations of the Equal Protection Clause of the Fourteenth Amendment. (Doc. 27 at 1, 8; Doc. 88 at 1, 4). At the oral argument on Defendant's Motion, Plaintiffs argued that, although this case is ultimately an Establishment Clause case, "[t]here are other flavors and aspects of the U.S. Constitution that come into play," such as the Equal Protection Clause. (Doc. 105 at 23). Plaintiffs argued that "[i]t violates the individual's right to equal protection to address their government actor[.]" (*Id.* at 26). In response, Defendant – while conceding that the phrase appeared in the Second Amended Complaint – argued that Plaintiffs did not plead an Equal Protection argument in their Complaint. (*Id.* at 48-50). Defendant argued that, even if such a claim was properly pled, the Equal Protection clause does not apply because the speech at issue in this case is government speech, rather than individual speech. (*Id.* at 50).

In any event, and regardless of whether Plaintiffs' properly pled a claim under the Equal Protection Clause, such a claim must fail. Defendant has correctly noted that legislative prayer cases – such as this one – are subject to analysis only under the Establishment Clause of the First Amendment, and not under the Equal Protection Clause of the Fourteenth Amendment. *See, e.g.*, *Simpson v. Chesterfield Cnty. Bd. of Supervisors*, 404 F.3d 276, 287-88 (4th Cir. 2005) (holding in a legislative prayer case that "the speech in this case was government speech 'subject only to the proscriptions of

County used its prayer policy as a "pretext" to support only Christian prayer; indeed, it suggests the opposite.

the Establishment Clause,'" and thus rejecting plaintiff's other claims, including an Equal Protection Clause challenge); *Atheists of Fla., Inc. v. City of Lakeland, Fla.*, 779 F. Supp. 2d 1330, 1341-42 (M.D. Fla. 2011) ("The proper analytical device in this [legislative prayer] case is the Establishment Clause, and not the Equal Protection or Free Speech clauses—Plaintiffs' recouching their true claim (alleging a violation of the Establishment Clause) as a different constitutional species therefore changes nothing."). Plaintiffs' claim that the legislative prayer policy at issue in this case violates the U.S. Constitution has been fully analyzed under the Establishment Clause of the First Amendment. They are not entitled to argue the same claim under the Equal Protection Clause of the Fourteenth Amendment, nor would such a claim be successful. Accordingly, to the extent that Plaintiffs' have pled an Equal Protection Clause challenge, this claim will be **DISMISSED WITH PREJUDICE**.

### C.     Unlawful Seizure

Plaintiff Coleman has also argued that he was seized without probable cause when the deputy escorted him from the Commission meeting room and that the County is responsible for the deputy's actions because Commission members told the deputy to "get them out of here." Coleman also contends that the Commission is liable because no one did anything "to stop the deputy, or correct the situation," arguing that the failure of the Commissioners to correct the deputy's actions constitutes ratification.

The Fourth Amendment protects citizens against unreasonable searches and seizures by the government. U.S. Const. amend. IV. A person may be seized in violation of the Fourth Amendment if "a reasonable person would not feel free to leave an encounter with police." *United States v. Campbell*, 486 F.3d 949, 956 (6th Cir. 2007) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 834 (6th Cir. 2005)). Because

Defendant did not argue in its Motion for Summary Judgment that Plaintiff Coleman was not seized, the Court will *assume* – solely for the purposes of this Order – that Plaintiff Coleman was "seized" under the Fourth Amendment.[16]

Defendant argues that the County cannot be liable to Plaintiff Coleman for unlawful seizure because the County did not direct removal of Plaintiff from the meeting room and any such seizure was not an action of its agent taken in accordance with any County custom or policy. It is well settled that municipalities and other local governing bodies may be sued under § 1983. *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978). In order to establish municipal liability under § 1983, however, "the plaintiff must establish that: (1) the plaintiff's harm was caused by a constitutional violation; and (2) the [municipality] was responsible for that violation." *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009); *Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397,

---

[16] Although Defendant argued in its reply brief and at the oral argument that Plaintiff Coleman was not, in fact, "seized," the Defendant made no such argument in its pending Motion for Summary Judgment. Thus, for the purposes of deciding the instant Motion, the Court must assume, without deciding, that Plaintiff Coleman was, in fact, seized. The Court will not, however, prevent Defendant from presenting such an argument as a defense at the trial of this matter.

The Court has its own reservations about Plaintiff Coleman's argument that he was "seized" when he was asked or made to leave the commission meeting. At the oral argument on Defendant's instant Motion, the Court noted that "if a police officer tells me to get out of here, that seems to me to be the antithesis of an arrest or seizure because . . . [an] arrest or a seizure is when the police officer detained me for some period of time saying you're not free to leave." (Doc. 10). The Court concedes that at least one federal court has found that the Fourth Amendment is invoked in cases where plaintiffs did not feel "free to stay." *See Beverlin v. Grimm*, 1995 WL 470274, at *3 n.1 (N.D. Ill. Aug. 4, 1995) ("In the case at bar, the question was not whether Beverlin and her children were 'free to leave,' but whether they were free *to stay*. But we think the [Fourth Amendment] is applicable to unlawful interference with freedom of movement whether it be exerted by preventing a person from leaving or by forcing her to leave."); *see also Bennett v. City of Eastpointe*, 410 F.3d 810, 834 (6th Cir. 2005) (noting that "Fourth Amendment jurisprudence suggests a person is seized not only when a reasonable person would not feel free to leave an encounter with police, but also when a reasonable person would not feel free to *remain* somewhere, by virtue of some official action," and holding that genuine issues of material fact remained as to whether plaintiff was "seized" when he was asked to walk back to Detroit but was not physically escorted). However, this unpublished case from the Northern District of Illinois is not binding upon the Court, and the Court is not convinced that it was properly decided based on the current state of Fourth Amendment jurisprudence, or that these cases are factually similar enough to the instant case so as to be instructive. Thus, while the Court will assume for the purposes of this Order that Plaintiff Coleman was "seized," the parties are on notice that the Court may require additional legal argument regarding this issue, and could well determine at trial that this claim fails as a matter of law.

404 (1997) (noting that a plaintiff seeking municipality liability under § 1983 "must . . . demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. A plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.").

To demonstrate that a municipality is responsible for a constitutional violation, a plaintiff must point to some "policy" or "custom" of the municipal defendant causing the complained-of constitutional violation. *Monell*, 436 U.S. at 691. However, municipal liability "may be imposed for a single decision by municipal policymakers under appropriate circumstances," such as "where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 482 (1986). Accordingly, the Supreme Court has held that "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483. "[W]hether a particular official has final policymaking authority is a question of *state law*." *Crosby v. Pickaway Cnty. Gen. Health Dep't*, 303 F. App'x 251, 256 (6th Cir. 2008) (quoting *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737 (1989)). The Court's consideration of such a question requires reference to "statutes, ordinances, and regulations, and less formal sources of law such as local practice and custom." *Rowell v. Madison Cnty., Tenn.*, 2009 WL 1918078, at *6 (W.D. Tenn. July 2, 2009) (quoting *St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988)).

Defendant argues that Plaintiff's removal from the July 12, 2012 Commission meeting was an isolated incident of misconduct by a nonpolicymaking employee – that

is, the deputy who removed Coleman and Moyer from the meeting – which does not warrant the application of *Monell* liability. *See Vinson v. Campbell Cnty. Fiscal Court*, 820 F.2d 194, 200 (6th Cir. 1987). It is true that if the Court were to credit Defendant's version of the facts – that is, Chairman Henry merely told the deputy to escort Moyer to his seat and said nothing else prompting the deputy to remove Moyer and Coleman from the meeting – it may well be able to conclude that *Monell* is inapplicable and that Defendant is entitled to summary judgment.

However, the Court cannot simply ignore the version of facts presented by Plaintiffs; in fact, at this stage of these proceedings, the Court is *required* to construe all facts and all reasonable inferences therefrom *in favor* of Plaintiffs. Plaintiffs have presented evidence that one or more members of the Commission directed the deputy to remove Plaintiff Coleman and Moyer from the July 12, 2012 meeting, through gestures and words, including "get them out of here." Assuming Plaintiffs' facts to be true, a jury could determine that a deliberate decision was made to remove Coleman and Moyer from the Commission meeting by a member of the Commission. If Plaintiffs' facts are credited, and if Plaintiff is able to demonstrate that Commission members have final policymaking authority for the County under state law, Plaintiff may be able to prevail under a one-time policy theory of *Monell* liability.[17]

The Court thus finds that genuine issues of material fact remain as to the precise events that transpired at the July 12, 2012 County Commission meeting, and that factual and legal issues remain as to whether Henry and the other Commissioners were final policymakers for the purpose of supporting a § 1983 action against the County.

---

[17] Neither party offered argument or evidence regarding the final policymaking authority of the Commissioners, either in their briefs or at oral argument.

Accordingly, Defendant's Motion for Summary Judgment will be **DENIED** with respect to Plaintiff Coleman's Fourth Amendment seizure claim.

## IV. CONCLUSION

And so, like the world, this lawsuit ends not with a bang but a whimper.[18]  What began as a case with the potential for significant constitutional implications in the area of Establishment Clause jurisprudence ends as a run-of-the-mill seizure case of little or no precedential significance.[19]  Only because there exists an apparent factual dispute concerning the precise events and circumstances which gave rise to the alleged illegal seizure will the competing versions of those events be submitted for trial.

For the reasons stated herein,

- Defendant's Motion for Summary Judgment (Doc. 83) is hereby **GRANTED IN PART** and **DENIED IN PART**;

- Plaintiffs' claims arising under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the U.S. Constitution will be **DISMISSED WITH PREJUDICE**;

- Plaintiff Coleman's claims arising out of his alleged seizure at the July 12, 2012 County Commission Meeting – that is, unlawful seizure pursuant to 42 U.S.C. § 1983, negligence under Tennessee law, and assault under Tennessee law – will **PROCEED TO TRIAL**;

- Counsel for both parties are hereby **ORDERED** to confer regarding mutually agreeable alternative dates for the jury trial of this action. The parties **SHALL** submit for the Court's consideration **at least five** mutually agreeable dates for the trial in the 2015 calendar year. The parties **SHALL** submit their proposed dates via email to Mattice_chambers@tned.uscourts.gov **no later than May 12, 2015**.

---

[18] T.S. Eliot, *The Hollow Men* (1925).

[19] "[I]t is a tale . . . full of sound and fury, signifying nothing."  William Shakespeare, *MacBeth*, act 5, sc.5.

**SO ORDERED** this 22nd day of April, 2015.


_____/s/ Harry S. Mattice, Jr._____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE